[Cite as *State v. Prescott*, 2019-Ohio-5114.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | Nos. 107784 and 107789 |
| v. | : | |
| TYJOHN PRESCOTT, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 12, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-17-620732-B and CR-17-622725-B

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian Lynch and Eleina Thomas, Assistant Prosecuting Attorneys, *for appellee.*

Charles Ruiz-Bueno Co., L.P.A., and J. Charles Ruiz-Bueno, *for appellant.*

LARRY A. JONES, SR., P.J.:

{¶ 1} Defendant-appellant, Tyjohn Prescott ("Prescott"), appeals his multiple convictions stemming from his participation in eight separate robberies. Finding no merit to the appeal, we affirm.

{¶ 2} The state alleged that during July and August 2017, Prescott, who was 19 years old and approximately six feet tall, used his girlfriend's distinctive car to commit eight aggravated robberies in the cities of Cleveland and Solon. Prescott was charged in Cuyahoga C.P. No. CR-17-620732-B with one count each of aggravated robbery, robbery, and kidnapping. All counts contained one- and three-year firearm specifications. He was also charged in Cuyahoga C.P. No. CR-17-622725-B with 13 counts of aggravated robbery and 13 counts of kidnapping, both with one- and three-year firearm specifications; three counts of receiving stolen property; one count of failure to comply; two counts of felonious assault; one count of grand theft with one- and three-year firearm specifications; and six counts of having weapons while under disability.

{¶ 3} Prior to trial, the state dismissed the having weapons while under disability counts. The matter proceeded to a single jury trial on both cases, at which the following pertinent evidence was presented. All events took place in the city of Cleveland, unless otherwise noted.

**Robbery 1**

{¶ 4} On July 2, 2017, at 10:20 p.m., Nidal Rashid ("Nidal") was walking from Edison's Pizza to his friend's house in Tremont. Nidal testified that three black males approached him in a car. Two of the males got out of the car and pointed guns at his face. One of the males stood in front of him, and the other stood behind him. The males told Nidal to "stay cool, and nothing is gunna happen," but Nidal resisted, telling the men to shoot him because they were not going to rob him. One of the

males grabbed Nidal by his shirt and ripped it. The men then returned to their vehicle and left.

{¶ 5} Nidal described the male who stood in front of him as a bit taller than 5'11", 18 or 19 years old, a black male with a well-trimmed beard holding a silver plated gun. Nidal described the second gunman as much taller and thinner and testified that this male had his face partially covered with a bandana. The second man's gun was dark colored and bigger. Nidal described the gunmen's car as a black or dark car that looked like a Chevy Cavalier. Prescott's girlfriend, Cee Asia Emphrey ("Emphrey"), testified that she loaned her car to Prescott on July 2. Prescott had two friends with him. Emphrey testified that she owned a blue Pontiac with a white passenger door and that Prescott is the only other person who drives her car.

{¶ 6} As part of their investigation, police used cell phone tracking technology. Todd Wiles ("Wiles"), a crime analyst with the Cleveland police, testified how investigators are able to pinpoint the general area of a cell phone, and thus its user, by utilizing call records and cell phone tower information. When the user makes a phone call, Wiles explained, the cell phone pings to a certain tower in the user's given area, meaning that at the time of the call, the caller was in the area of that tower's geographical location.

{¶ 7} Wiles compiled the information received from the cell towers and Prescott's cell phone records to map out the specific calls made in the area of the cell phone towers during the time frame of the eight robberies. Phone records from

Robbery 1 show that Prescott's cell phone pinged a cell phone tower just east of Tremont at 10:13 p.m., about seven minutes before the robbery occurred.

**Robbery 2**

{¶ 8} The same evening, around 11:30 p.m., two teenage brothers were walking home from a relative's house. The brothers were walking by their high school, near West 57th Street and Bridge Avenue, when three men got out of a car and pointed guns at their heads. The men ordered the brothers on the ground, demanded their money, and said not to look at them. The men said they would shoot the brothers if they did not comply.

{¶ 9} Once they were on the ground, the men ordered the brothers to take off their shoes and empty their pockets. One of the gunmen pressed his gun to the older brother's head and took his cell phone.

{¶ 10} The brothers described the gunmen as African American males in their teens or twewnties. The older brother testified that one of the gunmen wore a black Adidas hooded jacket with three white stripes down the arm. The police later found a jacket matching that description in Prescott's house. During trial, the older brother identified that jacket as the jacket one of the gunmen was wearing during the robbery.

{¶ 11} After the robbery, the men got back into their car and sped away. The older brother described the car as a dark color Mitsubishi with a white passenger door. During trial, he identified Emphrey's car as the car the gunmen were driving.

He made his identification from still shots recovered from a security camera at the high school. The younger brother described the car as a "little" black or blue car with a white passenger door.

{¶ 12} Cell phone records showed that Prescott's cell phone pinged the tower at 1795 West 25th Street at 11:23 p.m., seven minutes before, and near where the brothers were robbed. The state alleged that Prescott and his friends left Tremont after the unsuccessful robbery of Nidal and traveled west toward the area where they encountered the brothers. Prescott's cell phone was inactive during Robbery 2.

**Robbery 3**

{¶ 13} On July 9, 2017, around 10:00 p.m., three friends — Brandon, Angela, and Alexandria — were walking in the area of West 80th Street and Lake Avenue when three males approached them and told them that they were being robbed. One of the gunmen stuck his gun in Brandon's face. Brandon said "no," and another gunman punched him in the face. Alexandria screamed, and the men fled.

{¶ 14} During the robbery, the men took Alexandria's and Angela's purses, which contained their iPhones, credit cards, and identification. The men also tried to steal Brandon's camera, but were unsuccessful.

{¶ 15} The victims described their attackers as young black males who wore hoodies pulled down and scrunched around their faces. They described one male as tall and skinny and said that he was the one who pointed a gun in their faces. Brandon described the car the males were driving as a Chrysler with an "off color door," and said that it was "similar to like a Mercury Sable or Dodge Neon kind of

shape, which is the same as that Chrysler boxy bend end with a swoop nose." Angela said the car was a bluish-green color sedan with a white door. Alexandria said the car was dark, "maybe teal," and it had a white door. During trial, all three victims positively identified Emphrey's car as the vehicle used in the robbery from the still shots taken from the surveillance video in Robbery 2.

{¶ 16} Emphrey confirmed that Prescott and his friend, Roemale Brooks, used her car that night between 10:00 p.m. and 11:00 p.m.

{¶ 17} Cell phone records from that day show that Prescott's phone pinged near East 90th Street at 9:19 p.m., and then at 3560 East 55th Street at 11:33 p.m. Prescott's phone remained inactive between 9:21 p.m. and 11:33 p.m., during the time of the robbery.

{¶ 18} During their investigation, the police determined that Prescott was selling cell phones to "ECOATMs" at area Wal-Mart stores. An ECOATM is an automated kiosk that buys cell phones. When a user sells a cell phone to an ECOATM, the machine produces a secondhand dealer report that contains the date and time that the device was sold; the seller's name, date of birth, and address; the location of sale; the type and serial number of the device; an image of the seller's driver's license; and a picture of the seller at the kiosk. In order to complete a sale, the seller must insert his or her identification card, which the machine scans.

{¶ 19} ECOATM records show that Prescott sold Alexandria's cell phone at an ECOATM kiosk on July 12, 2017, three days after the robbery. Prescott received $5 for the phone. Prescott used his driver's license, and the kiosk's webcam image

showed Prescott making the transaction. During trial, Alexandria was able to identify her cell phone from the ECOATM secondhand dealer report.

**Robbery 4**

{¶ 20} On July 10, 2017, at 12:30 a.m., a young couple, Jessica and Eric, were saying goodnight to each other in Eric's apartment parking lot on Clinton Avenue in Ohio City. Jessica was seated in her car and Eric was standing outside the car. A young man approached the couple holding a gun that was either silver or cobalt gray. The man, described by Jessica as about 6 feet tall, pointed the gun at Eric's chest and threatened to shoot him. Another man, whom Jessica testified was shorter, entered the passenger side of Jessica's car and ripped Jessica's purse out of her hands, breaking the strap. Jessica's purse contained $200, credit cards, and her driver's license. Eric and Jessica described the men as young black males in their early twenties. Eric, who is 5'8" tall, said the man who held the gun against him was a few inches taller than he is.

{¶ 21} Eric pursued the males to see where they were headed, and saw them enter a black four-door sedan with a white passenger side door. Surveillance footage of the area captured the robbery. Emphrey later confirmed that she told the police that it was her car on the surveillance footage and that she did not have her car at that time.

{¶ 22} Eric was shown four different photo lineups, during which he identified four different suspects. He testified, however, that there were only two

males who committed the robbery. Eric identified Emphrey's car as the car used in the robbery using the still shots from the surveillance video in Robbery 2.

{¶ 23} Cell phone records showed that on July 10, 2017, at 12:10 a.m., Prescott's cell phone pinged at East 178th Street and St. Clair Avenue. At 12:12 a.m., Prescott's cell phone pinged in the area of Interstate 90, which, the state alleged, indicated movement toward Ohio City where Eric and Jessica were robbed. Prescott's phone did not ping again until 3:38 a.m. — his phone was inactive during the time the robbery occurred.

**Robbery 5**

{¶ 24} On July 10, 2017, around 11:00 p.m., a young couple, Zoe and Liam, were walking back to their car after stargazing in the Cleveland Metroparks on Cleveland's west side. They saw four men in a gray sedan with a white passenger door drive past them. The car turned around and pulled over on the side of the road. One man got out and claimed their car had broken down. Another man jumped out, said he had to use the bathroom, and pulled out a gun. He told the couple to drop their stuff. One of the men took Zoe's purse, which contained a phone charger, headphones, wallet, debit cards, identification, and cell phone. The men also took Liam's iPhone.

{¶ 25} Zoe testified that one of the robbers had a "black Glock," was six feet tall, in his early to mid-twenties, had a lean build, and wore a striped T-shirt. She testified that the other gunman was "maybe one or two inches shorter." During trial,

Zoe positively identified Emphrey's car as the car the gunmen were driving, using the same still shots from Robbery 2.

{¶ 26} Cell phone records indicated that Prescott's cell phone pinged on the east side of Cleveland around 8:30 p.m. and traveled west, going from East 74th Street and Carnegie Avenue (8:26 p.m.) to West 115th Street and Detroit Avenue (10:11 p.m.), to West 146th Street and Detroit Avenue (10:33 p.m.), to 15555 Hilliard Road (10:34 p.m.). At 10:39 p.m., Prescott's cellphone pinged on Hilliard Road, near the area of the Metroparks where the 11:00 p.m. robbery occurred.

{¶ 27} At 11:15 p.m., Prescott's cell phone pinged back on the east side of Cleveland, at East 93rd Street and Kinsman Avenue. Liam's cell phone tracking system showed his phone was in the area of East 73rd Street and Kinsman Avenue after it was stolen.

{¶ 28} ECOATM records show that Prescott sold Liam's cell phone at the South Euclid Wal-Mart the next day, July 11, 2017. Prescott used his driver's license to effectuate the transaction, and a kiosk webcam image showed him as the person making the sale.

**Failure to Comply**

{¶ 29} On July 18, 2017, Cleveland Police Officer Michael Harper ("Officer Harper") saw a blue Pontiac G6 speeding down Quincy Avenue. Officer Harper proceeded to initiate a traffic stop of the vehicle and saw that the vehicle was registered to Emphrey. Officer Harper approached the driver's side window and asked the driver for his identification. The driver sped away, almost running over

Officer Harper's foot. Officer Harper made the decision not to pursue the speeding car.

{¶ 30} Officer Harper was able to identify the driver as Prescott because he knew who Prescott was. Officer Harper also knew Prescott as "Pooder." He identified Emphrey as the passenger. The traffic stop was captured on Officer Harper's body camera, which was admitted into evidence.

{¶ 31} The next day, July 19, Officer Harper witnessed the same Pontiac G6 speeding down East 93rd Street. The officer initiated a traffic stop and called for backup. Officer Harper identified the driver as Prescott and the other occupants of the car as Kameron Dixon, Keith Adkins, and Roemale Brooks.

**Robbery 6**

{¶ 32} On August 5, 2017, around 10:30 p.m., friends Marc and Tina were robbed after eating dinner near West 65th Street and Detroit Avenue. While they were walking to their car, a car stopped in the middle of the road and blinked its lights. Both Marc and Tina became suspicious. The car drove up the block, and three males walked around the corner towards them. Tina got into Marc's car, but the three men stopped Marc before he was able to get into the car. Marc testified that all of the men had guns.

{¶ 33} One of the gunmen took Marc's wallet, which contained $80, his driver's license, credit cards, and his iPhone. Another one of the men attacked Tina in the car. Tina fought back, and the male pistol-whipped her in the face, causing

serious injuries.[1]  The man took Tina's bracelets, necklace, ring, car keys, purse, and iPhone.  Tina's jewelry was valued at over $25,000.

**{¶ 34}** Tina and Marc described their attackers as young black males wearing white T-shirts and blue jeans and carrying semi-automatic weapons.  They described one attacker as tall, around 6'4", one man as average height, between 5'8" and 5'10", and one man as short, around 5'6" or 5'7".  Marc said the gunmen were in a maroon or dark blue Dodge Neon that had "something white" on the passenger side of the car.

**{¶ 35}** After the robbery, police used Tina's phone tracking system to locate her phone.   At 3:00 a.m., Tina's phone pinged to a vacant lot located directly next door to Prescott's house.  The same day, on August 6th, the iPhone tracking system pinged Tina's phone to the Wal-Mart in South Euclid.  Police tracked the phone and found that it had been sold at the ECOATM kiosk.  The ECOATM secondhand dealer records indicated that Prescott sold the phone at 2:26 p.m. on August 6, 2017.

**{¶ 36}** The ECOATM images from the transaction showed Prescott holding Tina's iPhone and standing next to his brother, John Prescott.   Wal-Mart surveillance footage also showed Prescott holding a second iPhone.   During this transaction, the ECOATM system "flagged" Prescott, preventing him from selling any more phones.

---

[1]The injuries to Tina formed the basis of the felonious assault charges against Prescott.

{¶ 37} On August 15, 2017, Emphrey sold Marc's phone to the same ECOATM kiosk. Prescott, who was no longer able to sell phones, is on the kiosk video, standing next to Emphrey. Emphrey used her identification to make the transaction. Emphrey testified that Prescott handed her Marc's phone and "asked me could I put this in the machine for him."

**Robbery 7**

{¶ 38} On August 10, 2017, at 6:00 a.m., Alexander Barclay ("Alex"), the manager of a Chipotle restaurant located in Solon, was prepping for the day shift. He opened the back door of the restaurant to dump out mop water and noticed a "bluish" Pontiac G6 with a white door parked out back, next to the dumpster. Moments later, Alex heard a knock at the back door. Alex opened the door, saw an African American man, about 5'10" tall, wearing a hoodie and a mask and holding a silver handgun. The gunman entered the restaurant, and Alex ran into his office. When Alex came back out, he saw that the blue car was gone. During trial, Alex positively identified Emphrey's car as the car he saw by the dumpster that morning.

{¶ 39} Alex testified that Prescott's brother, John Prescott, worked for him at the Solon Chipotle. According to Alex, John would know the manager's schedule and the fact that managers enter the restaurant early in the morning; in fact, John reported to work a couple of hours after the robbery occurred. During a subsequent police search of Emphrey's car, police found a surgical mask and a ski mask underneath the passenger seat.

{¶ 40} Emphrey testified that Prescott left her house around 5:00 a.m. on August 10, 2017. Cellphone records showed that Prescott's cell phone pinged at 1:13 a.m., and not again until 6:59 a.m. on August 10, 2017.

{¶ 41} Also on August 10, police pulled over Prescott driving Emphrey's car. Detective Robert Norman ("Detective Norman") interviewed Prescott on scene, and Prescott told the detective that he had only sold cell phones twice at a Wal-Mart located at West 25th Street and Lorain Avenue. Detective Norman, who knew that no Wal-Mart existed at that location, continued his investigation, eventually determining that Prescott sold cell phones to area ECOATMs "over 15 times." The interview was captured on Detective Norman's body camera, was played for the jury, and was entered into evidence.

**Robbery 8**

{¶ 42} On August 20, 2017, at 2:45 p.m., three men robbed the Cricket Wireless store located at East 79th Street and Cedar Avenue. The manager, Justin, said three males came in and told him to get on the ground. The first man was wearing a gray hoodie and sweatpants and was 5'10" or 5'11", 160 pounds, and had a beard. Justin later identified this man as "Pooder." The men stole Justin's personal firearm.

{¶ 43} Witnesses saw three men flee Cricket Wireless and get into a Pontiac with a white door. The witnesses flagged down Regional Transit Authority police ("RTA police"). RTA police interviewed Justin. Justin testified that at first he did not know who robbed him, but after the RTA police told him what kind of car was

involved, he "put two and two together in his mind" and knew that "Pooder" and Roemale Brooks were two of the men involved. Justin did not know the name of the third man involved, but knew he was someone in the neighborhood that people "don't mess with."

**{¶ 44}** Emphrey told police that Prescott left the house with her car "around two something," and returned around 3:00 p.m. with Brooks and Charmarius Jackson. Emphrey told police they could find Prescott at his parents' house.

**{¶ 45}** The police conducted a "cold stand" to see if Justin could identify anyone involved in the robbery. Justin identified Prescott as "Pooder."

**{¶ 46}** Cell phone records showed that Prescott was at East 74th Street and Carnegie Avenue at 12:58 p.m. His phone was not active again until 3:00 p.m., 15 minutes after the Cricket Wireless robbery. Four more calls were placed at 3:03 p.m., 3:09 p.m., 3:14 p.m., and 3:16 p.m. from Prescott's phone, all utilizing the East 74th Street and Carnegie Avenue cell tower.

**{¶ 47}** At the close of all evidence, the jury convicted Prescott of all counts. The trial court sentenced Prescott to a total sentence of 25 years in prison. Prescott filed a notice of appeal in both cases, and we consolidated his cases for briefing and disposition.

**Assignments of Error**

Prescott raises two assignments of error for our review:

I. The evidence adduced at trial was insufficient to sustain a verdict against defendant-appellant.

II. The trial court committed prejudicial error by improperly allowing evidence into the trial for the jury to consider.

**Sufficiency of the Evidence**

{¶ 48} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 49} Prescott claims that there was insufficient evidence to support his convictions because none of the victims could identify him as a participant in the robberies. Prescott further claims that the victims' inconsistent description of the car used in the robberies would "lead reasonable minds to the conclusion" that his use of his girlfriend's car did not place him at the scene of any of the robberies.

{¶ 50} "'[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others.'" *Jenks* at 272 quoting *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's

fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks* at *id.*

{¶ 51} Prescott was convicted of multiple counts of the following offenses: aggravated robbery in violation of R.C. 2911.01(A)(1); robbery in violation of R.C. 2911.02(A)(2); kidnapping in violation of R.C. 2905.01(A)(2); felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2); receiving stolen property in violation of R.C. 2913.51(A); failure to comply in violation of R.C. 2921.331(B); grand theft in violation of R.C. 2913.02(A)(4); and various one- and three-year firearm specifications in violation of R.C. 2941.141 and 2941.145, respectively.

{¶ 52} Prescott's arguments focus on the sufficiency of the evidence that he was the one who committed each of the eight robberies and other attendant crimes. As this assigned error only concerns identity, we need not analyze every element of each offense. *See State v. Gordon*, 2018-Ohio-2292, 114 N.E.3d 345, ¶ 51 (8th Dist.). Upon review of the record, we find that the state presented sufficient evidence that, if believed, would convince the jury of Prescott's guilt.

{¶ 53} Although the victim in Robbery 8, Justin, was the only witness able to positively identify Prescott, there was substantial evidence to link him to each of the robberies. Witnesses positively identified Emphrey's car as the car that was used during the robbery in six out of eight of the robberies. Emphrey testified that during the time in question, she and Prescott lived together and no one else lived with them. She used her car for work and would also lend her car to Prescott. Emphrey testified

that she routinely left her car keys on a hook on the wall so it was possible that Prescott's friends could have used her car without her knowledge. She repeatedly denied, however, that anyone other than herself or Prescott ever drove her car:

Defense counsel: Didn't you allow other people to drive the car other than Tyjohn?

Emphrey: No.

Defense counsel: You never did? You sure of that?

Emphrey: Yes.

Defense counsel: Do you have a brother?

Emphrey: Yes. * * *

Defense counsel: Does he drive the car?

Emphrey: No.

Defense counsel: Anybody else in the family that is a male that would drive the car?

Emphrey: No.

{¶ 54} Additional substantial evidence linked Prescott to the robberies, including cell phone records and the sale of multiple victims' cell phones to ECOATM kiosks.

{¶ 55} In light of the above, we find sufficient evidence to sustain Prescott's convictions.

The first assignment of error is overruled.

**Admission of Evidence**

{¶ 56} In the second assignment of error, Prescott argues that the trial court committed prejudicial error by admitting certain evidence.

{¶ 57} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 104, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. We review a trial court's decision regarding the admission of evidence for an abuse of discretion.

{¶ 58} Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). In addition, pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See also* R.C. 2945.59.

**Admission of Social Media Posts**

{¶ 59} Prescott contends that it was error for the trial court to deny his pretrial motion in limine, which sought to limit the introduction of social media posts from his Facebook and Instagram accounts.

{¶ 60} Prior to trial, the state filed a notice to use other acts evidence pursuant to Evid.R. 404(B), stating that it was planning on introducing photographs from Prescott's Facebook and Instagram accounts that showed him displaying firearms, reasoning, in part, that the pictures were probative because they were all taken "within a 4 month time frame of the charged robberies." Prescott objected by filing a motion in limine to exclude the evidence, arguing that he would be unfairly prejudiced by the pictures.

{¶ 61} The trial court heard arguments on the matter at a pretrial hearing and overruled Prescott's motion in limine, stating:

> You know, having a gun is not a crime, and you know, being on Facebook, you know, brandishing weapons with a friend is not necessarily a crime. So in the sense that this is information that this defendant has published to the world already himself, [the] court's inclined to permit it in.

> It's evidence about who he is and his activities and what he does. It's relevant to the case. And therefore, the court will grant that at this time.

{¶ 62} Prescott contends that the admission of the photographs was improper as "other acts" evidence because it tended to show that he is the type of person who has a gun; therefore, it is probable to conclude that he acted in conformity therewith in committing the robberies.

{¶ 63} In *State v. Patterson*, 1st Dist. Hamilton No. C-170329, 2018-Ohio-3348, ¶ 16, the court held that the trial court did not abuse its discretion in admitting a photograph of a defendant with a gun where a witness testified that a similar gun was used in the commission of the crime. In *Gordon*, 8th Dist. Cuyahoga No. 106023, 2018-Ohio-2292, this court found that a Facebook photo of the defendant holding a gun was improperly admitted as "other acts" evidence because the state did not suggest that one of the guns in the photograph was the murder weapon actually used. This court concluded, however, that any error was harmless due to the substantial independent evidence of the defendant's guilt. *Id.* at ¶ 73.

{¶ 64} In this case, six social media pictures were introduced into evidence:

(1) Exhibit 112, Prescott's Facebook profile, which showed a photo of Prescott, a photo of a deceased friend of Prescott's playing football, and Prescott's profile name "Pooder StuntSillyy";

(2) Exhibit 112B, an undated Facebook photo posted by Prescott of Prescott holding money and standing with three friends, including Roemale Brooks, who was taking the photo;

(3) Exhibit 112C, an undated Instagram photo of Prescott from "Pooder StuntSillyy's" profile in which Prescott is holding a large semi-automatic firearm;

(4) Exhibit 156, a Facebook "mobile upload" photo dated November 5, 2016, of Prescott and his brother "Kamm," in which Kamm is holding money and Prescott is sitting with a silver gun in front of him;

(5) Exhibit 179F, Facebook photo sent June 13, 2017, via the Messenger app and showing Prescott holding a long rifle and Brooks pointing a silver gun at the camera;

(6) Exhibit 179G, Facebook photo sent April 22, 2017, via the Messenger app, in which Prescott appears leaning back in a chair with

a handgun "with a silver slide and a black grip" on his chest and pointing a larger weapon at the camera.

{¶ 65} The trial court did not err in allowing in Exhibit Nos. 112 and 112B. Exhibit No. 112 was probative of "Pooder's" identity as Prescott. Exhibit No. 112B was probative of "Pooder's" identity as Prescott and his association with Brooks. We do not find Prescott's mere holding of money to be unduly prejudicial.

{¶ 66} The other exhibits, however, clearly fall within the scope of Evid.R. 404(B). The court itself stated that the photos were "evidence about who [Prescott] is and his activities and what he does" — Evid.R. 404(B) prohibits admission of photos for this purpose. The state did not allege that the firearms displayed in the exhibits were the same used in the robberies. For example, in Exhibit 112C, Prescott is pictured holding a large semi-automatic weapon. None of the witnesses alleged the gunmen used this type of firearm. Exhibit No. 156 is dated November 2016, outside the four-month time frame the state alleged the photos were taken — this fact weighs against it probative value.

{¶ 67} The state sought to introduce these inflammatory photographs to show that Prescott is the type of person who carries weapons, and therefore, it is probable to conclude that he acted in conformity therewith in committing the robberies. In light of the above, we find that Exhibit Nos. 112C, 156, 179F, and 179G were admitted in error.

{¶ 68} Our analysis does not end here, however. Pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights

shall be disregarded." This court has held that a "nonconstitutional error is harmless when there is substantial other evidence to support the guilty verdict." *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 97; *see also State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 88 (applying nonconstitutional harmless-error analysis to erroneous admission of other acts evidence).

{¶ 69} After review of the record, we find that the error was harmless. The state presented substantial other evidence of Prescott's guilt including cell phone records, ECOATM records, and victim and witness testimony.

**Admission of Codefendant's Arrest**

{¶ 70} Prescott also challenges allowing into evidence testimony that Roemale Brooks was charged in connection with the August 20, 2017 robbery at Cricket Wireless.

{¶ 71} This court has held that a codefendant who has pleaded guilty to or has been convicted of an offense stemming from the same facts or circumstances forming the basis of a prosecution against another is inadmissible as proof against the other. *State v. Kartsone*, 8th Dist. Cuyahoga No. 95104, 2011-Ohio-1930, ¶ 31.

> Evidence that a codefendant has pleaded guilty may not be used as substantive proof of a defendant's guilt. However, such evidence is admissible to impeach, to show the witness's acknowledgment of participation in the offense, or to reflect on his credibility. In such circumstance the jury should be instructed that the evidence is received for one or more of these purposes alone, and that the jurors are not to infer the guilt of the defendant.

(Citations omitted.) (Karpinski, J., concurring). *Id.* at ¶ 40.

{¶ 72} The *Kartsone* court found that it was improper for the prosecution to reference the specific disposition of the codefendant's case and concluded that the prosecutor's actions prejudicially affected the appellant's substantial rights. *Id.*

{¶ 73} *Kartsone* is distinguishable from this case. Here, the state did not seek to admit testimony that Brooks had been convicted in connection with the Cricket Wireless robbery, only that he had been charged with a crime. Even if, however, it was error for the court to allow Brooks's charge into evidence, we find that it would not have affected the outcome of the case given the substantial evidence of Prescott's guilt.

{¶ 74} In light of the above, the second assignment of error is overruled.

{¶ 75} There was sufficient evidence to support Prescott's convictions. Although the trial court erred in allowing certain social media posts from Facebook and Instagram in contravention of Evid.R. 404(B), the error was harmless given the substantial independent evidence of Prescott's guilt.

{¶ 76} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

RAYMOND C. HEADEN, J., CONCURS;
MICHELLE J. SHEEHAN, J., CONCURS
IN JUDGMENT ONLY