[Cite as *State v. Pattson*, 2022-Ohio-150.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case Nos. 29028 and 29029 |
| | : | |
| v. | : | Trial Court Case Nos. 2019-CR-4013 |
| | : | and 2019-CR-4052/1 |
| DARRIUS PATTSON | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of January, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant
Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division,
Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ALAN D. GABEL, Atty. Reg. No. 0025034, P.O. Box 1423, Dayton, Ohio 45401
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Darrius Pattson, appeals from his convictions in the Montgomery County Court of Common Pleas after pleading guilty to several offenses in Case Nos. 2019-CR-4052/1 and 2019-CR-4013. In support of his appeal, Pattson contends that his guilty pleas were not knowingly, intelligently, and voluntarily entered because the trial court's plea colloquy failed to inform him of his constitutional right to compulsory process for obtaining witnesses and failed to properly notify him of his maximum possible prison sentences. Pattson also contends that the trial court erred by failing to merge his aggravated burglary, aggravated robbery, and aggravated menacing offenses as allied offenses of similar import. For the reasons outlined below, the judgments of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On March 12, 2020, a Montgomery County grand jury returned a nine-count indictment in Case No. 2019-CR-4052/1 charging Pattson with one count of aggravated burglary, a felony of the first degree; two counts of aggravated robbery, both felonies of the first degree; one count of kidnapping, a felony of the first degree; one count of having weapons while under disability, a felony of the third degree; two counts of aggravated menacing, both misdemeanors of the first degree; one count of cruelty to a companion animal, a misdemeanor of the first degree; and one count of grand theft, a felony of the fourth degree. The charges for aggravated burglary, aggravated robbery, kidnapping, and having weapons while under disability each carried a three-year firearm specification. The charges for aggravated burglary, aggravated robbery, and kidnapping also carried a

repeat violent offender specification.

{¶ 3} The aforementioned charges and specifications arose from a home invasion at the residence of James and Rhonda Beetem. It was alleged that Pattson and an accomplice kicked in the front door to the Beetems' residence after Pattson had his younger brother knock on the Beetems' door and ask to use the phone. During the invasion, Pattson and his accomplices threatened to kill the Beetems and their young children at gunpoint, injured their six-month-old puppy by shooting it, and stole various items of property from the Beetems' home. It was also alleged that Pattson and his accomplices forced Mrs. Beetem into the Beetems' vehicle at gunpoint and ordered her to drive them to an ATM to withdraw cash from her bank account. After taking the withdrawn cash, Pattson and his accomplices left Mrs. Beetem in an alley and drove away in the Beetems' vehicle.

{¶ 4} On November 20, 2020, Pattson pled guilty to all the charges in the indictment. Pattson also pled guilty to charges in Case No. 2019-CR-4013 for failure to comply with the order or signal of a police officer, having weapons while under disability, carrying a concealed weapon, and receiving stolen property. The four charges in Case No. 2019-CR-4013 arose from a separate incident during which Pattson fled from the police after he was discovered driving a stolen vehicle with a firearm in his possession. After accepting Pattson's guilty pleas in both cases, the trial court ordered a presentence investigation report ("PSI") and scheduled the matters for sentencing.

{¶ 5} On December 30, 2020, the trial court sentenced Pattson in both Case Nos. 2019-CR-4052/1 and 2019-CR-4013. With regard to Case No. 2019-CR-4052/1, the trial court imposed an indefinite sentence of six years to nine years in prison for aggravated

burglary. The trial court also imposed an indefinite sentence of six years to nine years in prison for each count of aggravated robbery and kidnapping, and it ordered those sentences to be served concurrently with the sentence imposed for aggravated burglary. The trial court additionally imposed 36 months in prison for having weapons while under disability, 180 days in jail for each of the aggravated menacing charges and the cruelty to a companion animal charge, and 18 months in prison for grand theft. Each of those sentences were ordered to run concurrently with each other and concurrently with the indefinite six-year-to-nine-year sentence imposed for the aggravated burglary, aggravated robbery, and kidnapping offenses.

{¶ 6} As for the firearm specifications, the trial court ordered the three-year firearm specification attached to aggravated burglary to be served consecutively with the three-year firearm specification attached to one of the aggravated robbery offenses. The trial court ordered those two firearm specifications to be served prior and consecutive to the indefinite six-year-to-nine-year sentence imposed for the offenses. All of the other firearm specifications were ordered to run concurrently with each other and concurrently with the two consecutive firearm specifications. The trial court did not impose a sentence for any of the repeat violent offender specifications. Accordingly, the trial court imposed an aggregate, indefinite sentence of 12 years to 15 years in prison for Case No. 2019-CR-4052/1.

{¶ 7} For Case No. 2019-CR-4013, the trial court imposed one year in prison for failure to comply with the order or signal of a police officer, nine months in prison for having weapons while under disability, six months in prison for carrying a concealed weapon, and six months in prison for receiving stolen property. The trial court ordered

the nine and six month sentences to be served concurrently with each other and consecutively with the one-year sentence imposed for failure to comply. Accordingly, the trial court imposed an aggregate sentence of one year and nine months in prison for Case No. 2019-CR-4013.

{¶ 8} The trial court ordered the prison sentences in Case Nos. 2019-CR-4052/1 and 2019-CR-4013 to be served consecutively. Therefore, for both cases, the trial court imposed a total, indefinite sentence of 13 years and 9 months to 16 years and 9 months in prison.

{¶ 9} Pattson now appeals from his conviction, raising three assignments of error for review.

**First and Second Assignments of Error**

{¶ 10} Under his first and second assignments of error, Pattson claims that his guilty pleas were not knowingly, intelligently, and voluntarily entered because, at the plea hearing, the trial court failed to: (1) inform him of his constitutional right to compulsory process for obtaining witnesses; and (2) properly notify him of the maximum possible prison sentences he could receive for his offenses. Based on these alleged failures, Pattson asks this court to vacate his guilty pleas.

*Crim.R. 11(C) and the Vacation of Guilty Pleas*

{¶ 11} "In determining whether to accept a guilty plea, the trial court must determine whether the defendant knowingly, intelligently, and voluntarily entered the plea." *State v. Brown*, 2d Dist. Montgomery Nos. 24520, 24705, 2012-Ohio-199, ¶ 13,

citing *State v. Johnson*, 40 Ohio St.3d 130, 532 N.E.2d 1295 (1988). "In order for a plea to be given knowingly and voluntarily, the trial court must follow the mandates of Crim.R. 11(C)." *Id.* Pursuant to Crim.R. 11(C)(2), the trial court may not accept a defendant's guilty plea to a felony offense without first addressing the defendant personally and:

> (a) Determining that the defendant is making the plea voluntarily, with understanding of the nature of the charges and of the maximum penalty involved, and if applicable, that the defendant is not eligible for probation or for the imposition of community control sanctions at the sentencing hearing.

> (b) Informing the defendant of and determining that the defendant understands the effect of the plea of guilty or no contest, and that the court, upon acceptance of the plea, may proceed with judgment and sentence.

> (c) Informing the defendant and determining that the defendant understands that by the plea the defendant is waiving the rights to jury trial, to confront witnesses against him or her, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself.

Crim.R. 11(C)(2)(a)-(c).

{¶ 12} A defendant is generally "not entitled to have his plea vacated unless he demonstrates he was prejudiced by a failure of the trial court to comply with the provisions of Crim.R. 11(C)." *State v. Dangler*, 162 Ohio St.3d 1, 2020-Ohio-2765, 164 N.E.3d 286, ¶ 16, citing *State v. Nero*, 56 Ohio St.3d 106, 108, 564 N.E.2d 474 (1990). There are, however, two exceptions to this rule.

{¶ 13} The first exception concerns the constitutional rights advisement under Crim.R. 11(C)(2)(c). "When a trial court fails to explain the constitutional rights that a defendant waives by pleading guilty or no contest, we presume that the plea was entered involuntarily and unknowingly, and no showing of prejudice is required." *Id.* at ¶ 14, citing *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 31. The second exception occurs when a trial court completely fails to comply with a portion of Crim.R. 11(C), as this also "eliminates the defendant's burden to show prejudice." *Id.* at ¶ 15, citing *State v. Sarkozy*, 117 Ohio St.3d 86, 2008-Ohio-509, 881 N.E.2d 1224, ¶ 22. "Aside from these two exceptions, * * * a defendant is not entitled to have his plea vacated unless he demonstrates he was prejudiced by a failure of the trial court to comply with the provisions of Crim.R. 11(C)." *Id.* at ¶ 16, citing *Nero* at 108. "The test for prejudice is 'whether the plea would have otherwise been made.' " *Id.*, quoting *Nero* at 108.

*Compulsory Process Advisement – Crim.R. 11(C)(2)(c)*

{¶ 14} Pattson first argues that his guilty pleas were not knowingly, intelligently, and voluntarily entered because the trial court failed to strictly comply with the constitutional compulsory process advisement set forth in Crim.R. 11(C)(2)(c). Specifically, Pattson claims that the trial court erred in advising him that by pleading guilty he was waiving his "right to subpoena witness on his behalf" as opposed to his right to "compulsory process for obtaining witnesses," which is the specific language used in Crim.R. 11(C)(2)(c). Pattson asserts that the trial court's failure to adhere to the language in Crim.R. 11(C)(2)(c) and its failure to use the term "compulsory process" during its plea colloquy renders his guilty pleas invalid. We disagree.

{¶ 15} While strict compliance with the constitutional advisements in Crim.R. 11(C)(2)(c) is required, Pattson "mistakenly equates strict compliance with a requirement that the judge recite the provisions of Crim.R. 11(C)(2)(c) almost verbatim." *State v. Miller*, 159 Ohio St.3d 447, 2020-Ohio-1420, 151 N.E.3d 617, ¶ 17. In *Miller*, the Supreme Court of Ohio stressed that it "refuse[d] to require trial courts to use particular words during the plea colloquy" and recognized that it has "never mandated that a trial court use particular words in order to comply with Crim.R. 11(C)(2)(c)." *Id.* at ¶ 21 and ¶ 17, citing *State v. Veney*, 120 Ohio St.3d 176, 2008-Ohio-5200, 897 N.E.2d 621, ¶ 29 and *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E.2d 115 (1981), paragraph two of the syllabus.

{¶ 16} In *Ballard*, the Supreme Court explained that:

Failure to use the exact language contained in Crim.R. 11(C), in informing a criminal defendant of his constitutional right to a trial and the constitutional rights related to such trial, including the right to trial by jury, is not grounds for vacating a plea as long as the record shows that the trial court explained these rights in a manner reasonably intelligible to that defendant.

*Ballard* at paragraph two of the syllabus.

{¶ 17} Therefore, "a rote recitation of Crim.R. 11(C) is not required, and failure to use the exact language of the rule is not fatal to the plea." *Id.* at 480. " '[A] trial court can still convey the requisite information on constitutional rights to the defendant even when the court does not provide a word-for-word recitation of [Crim.R. 11(C)(2)(c)], so long as the trial court actually explains the rights to the defendant.' " *State v. Courtney*, 2d Dist. Clark No. 2013-CA-73, 2014-Ohio-1659, ¶ 8, quoting *Veney* at ¶ 27.

{¶ **18**} In *State v. Barker*, 129 Ohio St.3d 472, 2011-Ohio-4130, 953 N.E.2d 826, the Supreme Court of Ohio held that "a trial court complies with Crim.R. 11(C)(2)(c) when its explanation of the constitutional right to compulsory process of witnesses is described to the defendant during the plea colloquy as the 'right to call witnesses to speak on your behalf.' " *Barker* at ¶ 27. The court in *Barker* also held that "an alleged ambiguity during the plea colloquy may be clarified by reference to other portions of the record, including the written plea." *Id.*

{¶ **19**} More recently, in *Miller*, 159 Ohio St.3d 447, 2020-Ohio-1420, 151 N.E.3d 617, the Supreme Court of Ohio held that there was strict compliance with Crim.R. 11(C)(2)(c) where the trial court explained that the defendant's "lawyer [could] issue subpoenas to select [his] witnesses, get them on the witness stand" and that "[t]he Court [would] enforce those subpoenas to help [him] get them here to testify for [him]." *Id.* at ¶ 20-22. *Accord State v. Jones*, 5th Dist. Knox No. 20CA000020, 2021-Ohio-1864, ¶ 13 and ¶ 19-24 (holding that the trial court strictly complied with the compulsory process advisement in Crim.R. 11(C)(2)(c) by saying: "[Y]ou understand that at the trial your attorney could have obtained witnesses by subpoena to testify in your defense?").

{¶ **20**} Prior to *Barker* and *Miller*, other courts, including this one, have similarly held that language indicating that the defendant was waiving his right to call or subpoena witnesses on his behalf was sufficient for strict compliance with the compulsory process advisement. *See, e.g., State v. Moorefield,* 2d Dist. Champaign No. 99CA4, 1999 WL 1125121, *2 (Oct. 8, 1999) (holding that a trial court's explanation that defendant would, by his plea, waive his "right to make witnesses attend and testify" strictly complied with Crim.R. 11(C)(2)(c)); *State v. Ward*, 2d Dist. Montgomery No. 21044, 2006-Ohio-832,

¶ 12 (holding that a statement that the defendant was "giving up [his] right to have [his] own witnesses come in here and testify for [him]" was sufficient for strict compliance); *State v. Senich*, 8th Dist. Cuyahoga No. 82581, 2003-Ohio-5082, ¶ 31 (holding that when explaining the right to compulsory process "it is also sufficient for the trial court to explain that the defendant has the right to subpoena witnesses"); *State v. Parks*, 8th Dist. Cuyahoga No. 86312, 2006-Ohio-1352, ¶ 17 (holding that "the use of word 'subpoena' adequately informs defendant of his right to compulsory process"); *State v. Coleman*, 9th Dist. Summit No. 26008, 2012-Ohio-1712, ¶ 9-11 (holding that a statement indicating that "by pleading guilty [defendant] was giving up the right to have his counsel 'subpoena and cross-examine witnesses' " was sufficient to comply with Crim.R. 11(C)(2)(c)).

{¶ 21} In this case, the trial court made the following advisement at the plea hearing regarding the constitutional rights that Pattson was waiving by entering his guilty pleas:

> THE COURT:     Okay.  Do you understand that by pleading guilty, you're giving up your right to a jury trial?
>
> DEFENDANT:     Yes.
>
> THE COURT:     When you give up that right, you give up other rights including the right to confront or face witnesses against you; ***the right to subpoena witnesses on your behalf to attend and to testify***; and the right to require the State to prove your guilt beyond a reasonable doubt; and the right to remain silent.  You cannot be forced to testify against yourself at trial and if you elect

not to testify, your silence cannot be used against you in any way. Do you understand you're giving up those rights?

DEFENDANT: Yes.

(Emphasis added.) Plea Hearing Trans. (Nov. 25, 2020), p. 6.

{¶ 22} During the plea hearing, Pattson also indicated that he understood the written plea form and signed the form. The written plea form stated, in relevant part, the following:

The Court informed me and I understand that by pleading guilty I am waiving (giving up) my rights to a jury trial; to confront witnesses against me; **to have compulsory process for obtaining witnesses in my favor**; and to require the State to prove my guilt beyond a reasonable doubt at a trial at which I cannot be compelled to testify against myself.

(Emphasis added.) Waiver and Plea (Dec. 3, 2020), Montgomery C.P. No. 2019-CR-04052/1.

{¶ 23} Upon review, we find that the trial court's oral advisement at the plea hearing stating that Pattson was waiving "the right to subpoena witnesses on [his] behalf to attend and to testify" and the portion of the written plea form stating that Pattson understood that he was waiving his right "to have compulsory process for obtaining witnesses in [his] favor" properly informed Pattson of his constitutional right to compulsory process. At no point in time did Pattson claim that he did not understand this right or the other constitutional rights that he was waiving by pleading guilty. Accordingly, we find that the trial court strictly complied with Crim.R. 11(C)(2)(c) and that Pattson knowingly,

intelligently, and voluntarily waived his right to compulsory process.

*Maximum Penalty Advisement – Crim.R. 11(C)(2)(a)*

**{¶ 24}** Pattson next claims that his guilty pleas were not knowingly, intelligently, and voluntarily entered because the trial court's plea colloquy failed to sufficiently notify him of the maximum possible prison sentences he could receive by pleading guilty. In so arguing, Pattson takes issue with the trial court's initially advising him that he would receive between 9 to 15 years in prison in Case No. 2019-CR-4052/1 and then correcting that statement to reflect the application of the Reagan Tokes Law and indefinite sentencing. In doing so, the trial court stated the following at the plea hearing:

| | |
|---|---|
| THE COURT: | [T]he minimum sentence you could potentially receive on 2019-CR-4052, if all counts were run concurrently, would be nine years. Is that correct [prosecutor] Niles? |
| MS. NILES: | Yes, Your Honor. |
| THE COURT: | And so the minimum sentence that you will be receiving in this case will be a minimum sentence of nine years. But what the Court has indicated to not only the State of Ohio[,] but as well as your counsel here is that at the end of this case and sentencing, you will receive a sentence of between nine and 15 years. ***So you will receive potentially a nine-year sentence all the way up to a 15-year sentence[,] but nothing greater than*** |

*a 15-year sentence*. Do you understand that?

DEFENDANT:      Yes.

THE COURT:      And is that your understanding then of what you'll be pleading to and what the sentence will ultimately be in this case?

DEFENDANT:      Yes.

MS. NILES:      Your Honor, just for clarity's purpose. *That 15 years does not include the Reagan Tokes amount, does it?*

THE COURT:      That will – *no, because that will have to be an end part of that*. The minimum sentence you'll get is 15 years but the state legislature has required that *if I were to give you a 15-year sentence there's an indefinite part of that*. And we'll go through that at the sentencing; okay?

DEFENDANT:      Okay.

THE COURT:      Do you understand that? *So no, Ms. Niles, it does not*.

MS. NILES:      Thank you.

DEFENDANT:      Okay. All right.

(Emphasis added.) Plea Hearing Trans. (Nov. 25, 2020), p. 3-4.

{¶ 25} Pattson also takes issue with the trial court's using a hypothetical sentence at the plea hearing to explain the indefinite nature of the sentences he could receive for

his first-degree felonies in Case No. 2019-CR-4052/1.   In doing so, the trial court stated the following at the plea hearing:

THE COURT: * * * So each [first-degree-felony] count requires a mandatory sentence of anywhere between three and 11 years.   Okay?

DEFENDANT: Yes.

THE COURT: Now, because the state legislature has put in place an indefinite sentence – what that means is whatever sentence I give you, between three and 11 years, there is an indefinite end to that.   So whatever sentence I give you, it is presumed that you will be released at the end of that particular prison sentence.   Do you understand that?

DEFENDANT: Yes.

THE COURT: But if there are certain things that happen while you're in prison, at the end of that minimum sentence, whatever that sentence is between three and 11 years that I give you, the Department of Rehabilitation and Corrections can hold a hearing * * * and if they make certain determinations of your behavior while you are in prison – what security level that you were at, if there are any other issues, rule infractions or otherwise – that indicate to them that they should not release you at the

end of whatever sentence I give to you, they – the Department of Rehabilitations can hold a hearing, make those determinations and keep you for longer. And here's how that works. ***Let's assume that I give you a sentence of four years.*** Okay?

DEFENDANT: Yes.

THE COURT: ***The indefinite sentence by the legislature is half of four which is two, right?***

DEFENDANT: Yes.

THE COURT: ***So your sentence then would be four to six years.*** ***So at the end of four years it's presumed that you would be released from prison but if the Department of Rehabilitation and Corrections makes certain determinations at a hearing, they could keep you up to six years.*** Do you understand that?

DEFENDANT: Yes.

* * *

THE COURT: All right. So I want to go back then. So each of these are felonies of the first degree and they carry a mandatory sentence of between three and 11 years but that maximum end time would be 11 to 16 ½ years. Okay? Do you understand that?

DEFENDANT:      Yes.

THE COURT:      Because half of 11 is 5 ½.   You add 11 plus 5 ½ that's where we get to the 16 ½.   Okay?

DEFENDANT:      Yes.

THE COURT:      All right.   So you understand then the maximum sentence you could get then would be 11 to 16 ½ years.

DEFENDANT:      Yes.

(Emphasis added.)   Plea Hearing Trans. (Nov. 25, 2020), p. 14-16.

{¶ 26} Because the maximum penalty advisement required under Crim.R. 11(C)(2)(a) is a non-constitutional advisement, and because the trial court in this case did not completely fail to comply with that advisement at the plea hearing, Pattson must establish that he was prejudiced by the trial court's explanation of his maximum possible sentence in order to vacate his guilty pleas.   *Dangler*, 162 Ohio St.3d 1, 2020-Ohio-2765, 164 N.E.3d 286, at ¶ 15-16.   As previously discussed, "[t]he test for prejudice is 'whether the plea would have otherwise been made.' "   *Id.* at ¶ 16, quoting *Nero*, 56 Ohio St.3d at 108, 564 N.E.2d 474.

{¶ 27} In this case, Pattson cannot establish that he was prejudiced by the trial court's advising him at the plea hearing that he would receive between 9 to 15 years in prison for Case No. 2019-CR-4052/1.   This is because the trial court ultimately imposed an indefinite sentence of 12 years to 15 years in prison, which is within the 9-to-15-year range that was discussed at the plea hearing.   Even if we consider the fact that the trial court ordered the indefinite 12-year-to-15-year sentence to be served consecutively with

the 1-year-9-month sentence imposed in Case No. 2019-CR-4013, the total, aggregate sentence for those cases was an indefinite sentence of 13 years and 9 months to 16 years and 9 months, which was still within the range discussed at the plea hearing. It is still within the 9-to-15-year range because the trial court explained that the indefinite part of the sentence, i.e., the 16 years and 9 months, was not factored into the 15-year maximum. Because Pattson's sentence was in accord with the trial court's statements at the plea hearing, and because Pattson indicated that he understood the trial court's statements, Pattson cannot establish that he suffered any prejudice as a result of the trial court's stating that he would receive a sentence between 9 to 15 years in prison.

{¶ 28} We also find that the trial court's explanation of the indefinite sentencing scheme and the maximum possible indefinite sentence that Pattson could receive for each of his first-degree felonies was correct. The advisement that Pattson could receive a maximum of 11 years to 16 ½ years in prison for each of his first-degree felonies was not only given at the plea hearing, but it was also provided in the written plea forms that Pattson signed and stated he understood at the plea hearing. The record indicates that the trial court also advised Pattson of the correct maximum possible prison sentences he could receive for all the other offenses in Case Nos. 2019-CR-4052/1 and 2019-CR-4013.

{¶ 29} With regard to the trial court's use of a hypothetical indefinite sentence at the plea hearing, we note that the trial court never stated that it was going to actually impose that sentence. The purpose of the hypothetical sentence was simply to explain and clarify indefinite sentencing to Pattson and to inform Pattson that his sentence could be extended past the minimum sentence imposed. Because Pattson indicated that he understood the trial court's explanation of indefinite sentencing and the maximum

possible sentences at the plea hearing, and because Pattson failed to establish that he would not have entered his guilty pleas but for the trial court's hypothetical sentence, Pattson has not demonstrated any prejudice warranting the withdrawal of his guilty pleas in Case Nos. 2019-CR-4052/1 or 2019-CR-4013.

{¶ 30} Pattson's first and second assignments of error are overruled.


**Third Assignment of Error**

{¶ 31} Under his third assignment of error, Pattson challenges his sentence by claiming that the trial court should have merged his aggravated burglary, aggravated robbery, and aggravated menacing offenses as allied offenses of similar import. We disagree.


*Law Governing the Merger of Allied Offenses*

{¶ 32} R.C. 2941.25 governs allied offenses and it provides that: "Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). The statute also provides that: "Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B).

{¶ 33} " '[W]hen determining whether offenses are allied offenses of similar import

within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id*.

{¶ 34} As to import or significance, offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id*. at ¶ 26. "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import." *Id.*

{¶ 35} When considering whether offenses are committed separately, this court has recognized that if "one offense was complete before the other offense occurred, the two offenses were committed separately for purposes of R.C. 2941.25(B), notwithstanding their proximity in time and that one was committed in order to commit the other." *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. *Accord State v. Williams*, 12th Dist. Butler No. CA2018-02-030, 2018-Ohio-4261, ¶ 13; *State v. Margiotti*, 10th Dist. Franklin No. 19AP-469, 2021-Ohio-1826, ¶ 15-16; *State v. Spurrier*, 11th Dist. Lake No. 2020-L-069, 2021-Ohio-1061, ¶ 68. In other words, "when one

offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.). "To conclude otherwise would encourage those who break into buildings to steal to proceed with the theft since the offenses would merge for purposes of conviction and sentence." *Spurrier* at ¶ 68.

{¶ 36} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 26. " '[T]he defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.' " *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987). An appellate court applies "a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 37} As previously discussed, Pattson contends that the counts for aggravated burglary, aggravated robbery, and aggravated menacing were allied offenses of similar import that the trial court should have merged at sentencing. Although not explicitly argued in his brief, we presume that Pattson is arguing that his two aggravated robbery offenses should have merged, that his two aggravated menacing offenses should have merged, and that the aggravated robbery and aggravated menacing offenses then should have merged with each other and with the single count for aggravated burglary. We will address each of these claims separately below.

*Aggravated Robbery*

{¶ 38} Pattson was convicted of two counts of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that:

No person, in attempting or committing a theft offense * * * shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

{¶ 39} Upon review, we find that the record establishes that Pattson's two aggravated robbery offenses involved separate conduct and separate victims. During the first aggravated robbery, Pattson and his accomplices ransacked the Beetems' residence and stole various items of property from the residence while holding Mr. Beetem and his family at gunpoint. The record indicates that Pattson placed a gun to Mr. Beetems' head and forced Mr. Beetem into a bedroom where Pattson and his accomplices stole four guns. While in the bedroom, Pattson also forced Mr. Beetem to open the Beetems' safe at gunpoint.

{¶ 40} After stealing property from the Beetems' residence, Pattson engaged in separate conduct that formed the second aggravated robbery. Specifically, Pattson forced Mrs. Beetem into the Beetems' vehicle at gun point and had Mrs. Beetem drive him and his two accomplices to an ATM where they ordered Mrs. Beetem to withdraw cash from her bank account while pointing a gun to her head. Because Pattson's two aggravated robbery offenses arose from separate conduct, involved separate victims, and because the conduct took place at two separate places, i.e., at the Beetems' house and inside the Beetems' vehicle/at the ATM, the aggravated robberies did not merge as allied

offenses.

*Aggravated Burglary*

{¶ 41} Pattson was convicted of one count of aggravated burglary in violation of R.C. 2911.11(A)(2), which provides that:

No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: * * * (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 42} We note that this court has recognized that "[b]urglaries and robberies ' "are often not allied offenses of similar import because they involve two separate crimes; entering into the premises by force, stealth or deception, and then committing a theft offense." ' " *State v. Rice*, 2d Dist. Montgomery No. 28572, 2020-Ohio-4404, ¶ 21, quoting *State v. Terrel*, 2d Dist. Miami No. 2014-CA-24, 2015-Ohio-4201, ¶ 24, quoting *State v. Kay*, 2d Dist. Montgomery No. 25761, 2014-Ohio-2676, ¶ 21. *Accord Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, at ¶ 23 ("aggravated burglary and robbery are not allied offenses of similar import that must be merged because the burglary is complete upon entry into the victim's home, while a robbery subsequently committed once inside constitutes a new, separate offense that was committed separately in time").

{¶ 43} "Whether an intended [theft offense] was committed is irrelevant to the burglary charge. But where the intended [theft offense] is actually committed, a new

crime arises for which the defendant may be convicted." *State v. Frazier*, 58 Ohio St.2d 253, 256, 389 N.E.2d 1118 (1979). Therefore, "to commit burglary, [the defendant] [does] not have to actually commit a criminal offense inside the victim's residence, as the intent to commit any criminal offense while trespassing constitutes the commission of the burglary." *Rice* at ¶ 22, citing *State v. Chafin*, 2d Dist. Greene No. 2019-CA-69, 2020-Ohio-3983, ¶ 35.

{¶ 44} In this case, Pattson's aggravated burglary offense arose from Pattson kicking in the Beetems' door and forcefully trespassing inside the Beetems' residence while in possession of a firearm with the purpose to commit a criminal offense therein. In contrast, the aggravated robbery offenses arose from Pattson subsequently stealing various items of property from the Beetems' residence and bank account while brandishing a firearm. Therefore, the aggravated burglary and aggravated robbery offenses did not arise from the same conduct and involved separate, identifiable harms.

{¶ 45} As a further matter, Pattson completed the aggravated burglary once he forcefully entered the Beetems' residence with a firearm and the requisite criminal intent. Although the aggravated robberies were committed in close proximity to the aggravated burglary, the aggravated burglary had already been completed and thus was committed separately from the aggravated robberies. *See Turner* at ¶ 24; *Mooty*, 2014-Ohio-733, 9 N.E.3d 443, at ¶ 49. Because the aggravated burglary was committed separately from the aggravated robbery offenses, and because the aggravated burglary involved a separate, identifiable harm, it was appropriate for the trial court not to merge the aggravated burglary with either of the aggravated robbery offenses.

*Aggravated Menacing*

{¶ 46} Pattson was convicted of two counts of aggravated menacing in violation of R.C. 2903.21(A), which provides that:

> No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family.

{¶ 47} Upon review, we find that Pattson's two aggravated menacing offenses involved separate victims. The record indicates that after Pattson forced his way into the Beetems' residence, Pattson and his accomplices pointed guns at the Beetems and threatened to kill them. The record also indicates that Pattson placed a gun to Mr. Beetem's head and ordered Mrs. Beetem and their children to lay down on the ground and "shut the fuck up." PSI at p. 4; Sentencing Trans. (Dec. 30, 2020), p. 37. In other words, Pattson caused Mr. Beetem, Mrs. Beetem, and their children to believe that Pattson would cause serious physical harm to Mr. Beetem if they did not lay down and be quiet. This conduct constituted aggravated menacing against Mr. and Mrs. Beetem and their children. The fact that there are separate victims precludes a merger of the two aggravated menacing offenses.

{¶ 48} We also find that the two aggravated menacing offenses were committed separately from the aggravated burglary. Although the aggravated menacing offenses were committed in close proximity to the aggravated burglary, the record establishes that the aggravated menacing offenses arose from separate conduct that took place after the aggravated burglary had already been committed. As previously discussed, the

aggravated burglary was committed when Pattson forcefully entered the Beetems' residence with a firearm and the requisite criminal intent. After engaging in that conduct, Pattson engaged in the separate conduct of threatening to kill the Beetems and placing a gun to Mr. Beetem's head and ordering Mrs. Beetem and the children to lie down on the ground and be quiet. Because the aggravated menacing offenses were committed separately from the aggravated burglary, it was appropriate for the trial court not to merge those offenses at sentencing.

{¶ 49} The aggravated menacing offenses were also committed separately from the aggravated robbery offenses. The aggravated menacing offenses were committed once Pattson threatened to kill the Beetems at gunpoint and once Pattson ordered Mrs. Beetem and the children to lie down on the ground and be quiet while holding a gun to Mr. Beetem's head. After that initial encounter, Pattson and his accomplices proceeded to engage in separate conduct that formed the basis of the two aggravated robbery offenses. Specifically, Pattson and his accomplices ransacked the Beetems' home and forced Mr. Beetem into a bedroom at gunpoint in order to steal property and later forced Mrs. Beetem to withdraw money at an ATM. Because the conduct forming the aggravated robberies occurred after the aggravated menacing offenses had already been completed, it was appropriate for the trial court not to merge the aggravated menacing offenses with the aggravated robbery offenses.

{¶ 50} Because the aggravated burglary, aggravated robbery, and aggravated menacing offenses were not allied offenses of similar import that merge, Pattson's third assignment of error is overruled.

## Conclusion

**{¶ 51}** Having overruled all three assignments of error raised by Pattson, the judgments of the trial court are affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Alan D. Gabel
Hon. Mary E. Montgomery