[Cite as *State v. Consiglio*, 2022-Ohio-2340.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

ANTHONY CONSIGLIO,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0066**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 21 CR 53

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains*, Mahoning County Prosecutor and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee

*Atty. John P. Laczko*, City Center One, Suite 975, 100 East Federal Street, Youngstown, Ohio 44503, for Defendant-Appellant.

Dated: June 29, 2022

WAITE, J.

{¶1}   Appellant Anthony M. Consiglio appeals a July 7, 2021 Mahoning County Common Pleas Court judgment entry convicting him of rape, attempted rape, aggravated robbery, robbery, theft from a person in a protected class, domestic violence, and assault. Appellant challenges his convictions, arguing they are against the manifest weight of the evidence because he believes that he established the affirmative defense of not guilty by reason of insanity.  Appellant also challenges his sentence, arguing that it is contrary to law.  For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

{¶2}   On January 24, 2021 at approximately 6:00 p.m., Appellant unexpectedly visited the home of his grandmother, the victim in this case.  (Trial Tr., p. 16.)  Appellant lives in Youngstown.  His grandmother's house is located in Campbell.  The grandmother was 79-years-old at the time of the incident.  Appellant and his grandmother were not close but did not have a poor relationship.  Appellant did not often visit his grandmother, particularly alone.  The grandmother appeared happy to see him and allowed him inside the house.

{¶3}   Once inside, she escorted him to the living room where he lit up a cigarette. The grandmother reminded him that she did not permit smoking inside, however, she gave him an ashtray and allowed him to continue smoking.  At this point, Appellant lifted her shirt and put his hand on her chest.  She asked him to stop, reminding him of their

relationship. He ignored her pleas, pulled her by her hair and threw her to the ground. He put his knee in her back as he removed her clothes and then began to rape her. When he had difficulty maintaining an erection he briefly stopped.

{¶4} Appellant then took his grandmother by the throat and ordered her to perform oral sex on him. (Trial Tr., p. 19.) The grandmother pleaded with him to stop, again reminding him that she is his grandmother. He told her that he did not care who she was and ordered her to do as he said. The grandmother proceeded to perform oral sex on Appellant, stopping multiple times asking to stop or to be given water. Appellant ordered her to continue each time. On several occasions, the grandmother noticed Appellant appear to look out the window to see if anyone was near the house.

{¶5} At one point, the grandmother offered him money to stop. He declined and ordered her to continue. When Appellant again had trouble maintaining an erection, he allowed her to stop. In exchange, he said he would take one hundred dollars. As the grandmother only had $51, he took the money and told her he would return the next day for the rest. Before leaving, he took her cellphone, which was in the living room, and her home phone receiver, which was located in the kitchen. The home phone system appears to be wireless, and it does not appear that Appellant also took the base receiver. Before leaving, he told her twice not to tell anyone about the incident and that it would be their secret.

{¶6} When Appellant left, his grandmother ran to a neighbor's house and called the police and her daughter, who is Appellant's aunt. (Trial Tr., p. 28.) The timeline is somewhat unclear, but before police located Appellant, he called this aunt several times. She testified that when she finally answered his call, she did not discuss the incident for

– 4 –

fear that he would flee, but did ask him if he took his grandmother's phone. He replied that he took the phone by mistake and that he would return it the next day.

{¶7} Appellant was arrested at his mother's house in Youngstown, where he had been living in the basement. (Trial Tr., p. 44.) Officers located his grandmother's cell phone, home phone, and money. It appears from body camera video that the home phone and money were on Appellant's person and the cellphone was nearby. Appellant assisted the officers in locating the cell phone, claiming that he took the phones accidentally and that he planned to return them the next day.

{¶8} The officers brought Appellant to the Campbell police station and, as per department policy, interviewed him with two officers present. Despite the fact that Appellant remained handcuffed, he began an altercation with one of the officers, Det. Ryan Bloomer, and the two men ended up on the ground. At some point, the officers were able to restrain Appellant.

{¶9} On February 18, 2021, Appellant was indicted on one count of rape, a felony of the first degree in violation of R.C. 2907.02(A)(2), (B); one count of attempted rape, a felony of the second degree in violation of R.C. 2923.02, R.C. 2907.02(A)(2), (B); one count of aggravated robbery, a felony of the first degree in violation of R.C. 2911.01(A)(3), (C); one count of robbery, a felony of the second degree in violation R.C. 2911.02(A)(2); one count of theft from a person in a protected class, a felony of the fifth degree in violation of R.C. 2913.02(A)(1), (B)(3); one count of domestic violence, a misdemeanor of the first degree in violation of R.C. 2919.25(A), (D)(2); one count of assault, a felony of the fourth degree in violation of R.C. 2903.13(A), (C)(5); and one count of obstructing official business, a felony of the fifth degree in violation of R.C. 2921.31(A), (B). The latter two

counts, assault and obstructing official business, pertain to the incident at the police department.

{¶10} On March 4, 2021, Appellant filed a "Plea of Not Guilty By Reason of Insanity." Appellant also filed a motion seeking an evaluation of his competency to stand trial. After a hearing, the trial court issued a judgment entry finding the issue of competency moot after defense counsel informed the court that Appellant had been taking his medications and was able to assist in his defense. The court did order an evaluation for purposes of Appellant's insanity defense, and would later permit a second evaluation. The written evaluations were provided to the trial court and admitted into evidence.

{¶11} The two experts who prepared evaluations testified at a bench trial. The state's witnesses included: the victim, Geri Hunt (the victim's daughter and Appellant's aunt), Officer Tyler Thompson (Campbell Police Department), Det. Ryan Bloomer (Campbell Police Department), Lt. Kevin Sfera, and Dr. Jessica Hart (Forensic Psychiatric Center of Northeast Ohio). The following witnesses were called on behalf of Appellant: Appellant's mother, Beth Broker (family friend), and Dr. Robert Devies. Both Dr. Hart and Dr. Devies performed evaluations of Appellant pursuant to the two evaluations ordered by the trial court.

{¶12} At the conclusion of trial, the court found that the state had not included the obstruction of official business count within the bill of particulars, and found Appellant not guilty on that charge. However, the court found Appellant guilty on the remaining seven counts within the indictment. The court further found that Appellant had not met his

burden of proving the affirmative defense of not guilty by reason of insanity, finding that Appellant's expert witness lacked credibility.

{¶13} The state conceded that the aggravated robbery, robbery, theft from a person in a protected class, and domestic violence convictions merged for purposes of sentencing. The court additionally found that the rape and attempted rape convictions merged. On June 6, 2021, the court sentenced Appellant to an indeterminate sentence of an aggregate total of nineteen and one-half years to twenty-five years of incarceration. The court credited Appellant with 145 days served. It is from this entry that Appellant timely appeals.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE CONVICTION AGAINST APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE AFFIRMATIVE DEFENSE OF NOT GUILTY BY REASON OF INSANITY WAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE.

{¶14} Appellant argues that he met his burden of proving the affirmative defense of insanity through the state's witness (Dr. Hart), his own expert witness (Dr. Devies), and a family friend who happens to be a licensed counselor (Beth Brocker). Beginning with Dr. Hart, she testified Appellant suffered from paranoid schizophrenia, major depressive disorder, cannabis use disorder, and alcohol use disorder. She further testified that Appellant had no memory of the incident and had not been taking his medication at that time. Dr. Devies testified that Appellant's mental illness impacted his ability to make rational decisions and he lacked the ability to understand the wrongfulness of his actions

<u>Case No. 21 MA 0066</u>

at the time of the incident.  Appellant also cites to the testimony of Brocker, who interacted with him several days before the incident and opined that he was in a psychotic state.

{¶15} In response, the state points out that the trial court expressly found Dr. Devies' testimony was incredible.  The state argues that the record, especially the evidence provided by Dr. Hart, contains sufficient evidence to support the trial court's verdict.

{¶16} A plea of not guilty by reason of insanity "is an affirmative defense that must be proven by a preponderance of the evidence."  *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 17, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35; R.C. 2901.05(A).  An affirmative defense is reviewed under a manifest weight of the evidence standard.  *State v. Ford*, 8th Dist. Cuyahoga No. 109087, 2020-Ohio-4298, ¶ 25.

{¶17} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.)  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). It is not a question of mathematics, but depends on the effect of the evidence in inducing belief.  *Id.*  Weight of the evidence involves the state's burden of persuasion.  *Id.* at 390, 678 N.E.2d 541 (Cook, J. concurring).  An appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387, 678 N.E.3d 541, 678 N.E.2d 541.  This discretionary power of the

appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶18}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010 WL 2749627, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶19}** "A person is not guilty by reason of insanity only if he proves 'that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.' " *State v. Wade*, 2016-Ohio-8546, 71 N.E.3d 31, (7th Dist.), ¶ 42, citing R.C. 2901.01(A)(14). Although Ohio law formerly recognized the "irresistible impulse" defense, the legislature removed this component from the law in 1990. *State v. Nicholas*, 2nd Dist. No. 2018-CA-25, 2020-Ohio-3478, 155 N.E.3d 304, ¶ 90, appeal allowed, 161 Ohio St.3d 1439, 2021-Ohio-375, 162 N.E.3d 822, ¶ 90 (appeal allowed on other grounds).

Case No. 21 MA 0066

{¶20} At trial, two psychologists who had evaluated Appellant pursuant to court order testified. Although Appellant's friend, Brocker, is a certified counselor, she admittedly did not evaluate Appellant and did not have a professional relationship with him. As previously stated, Dr. Hart works for the Forensic Psychiatric Center of Northeast Ohio. She ultimately concluded that Appellant "has a severe mental disease, namely schizophrenia, but that his symptoms did not interfere with knowing the wrongfulness of his acts." (Trial Tr., p. 76.) Dr. Hart acknowledged that Appellant was not taking his medications at the time of the incident but found that this did not affect his ability to understand the wrongfulness of his acts. She testified that "[h]e had a very limited [memory] in the morning of his plans for the day and then he remembered basically after the instant offenses." (Trial Tr., p. 74.) She explained that although he claimed full memory loss, he also claimed to have memory of the morning and the remainder of the day and later asserted that he had regained some memory of the incident itself.

{¶21} Dr. Devies disagreed with Dr. Hart's conclusion and opined that Appellant did not understand the wrongfulness of his acts. (Trial Tr., p. 118.) Dr. Devies did not find the fact that Appellant stole two phones from the victim amounted to evidence that he knew his actions were wrong. Dr. Devies explained that a person in Appellant's state might have just taken whatever was nearby without any intent to necessarily prevent the victim from calling the police. However, Dr. Devies had trouble explaining why Appellant not only took the cell phone from the living room, but went into the kitchen and removed the home phone.

{¶22} Dr. Devies explained that he did not attempt to talk to Appellant about the incident after learning that he had regained memory. Specifically, he testified that "[w]hen

I went to see him in May, he had a record of being on the medication and he had regained memory for the incident and certainly acknowledged it was wrong, but did not necessarily know that he believed that it was wrong at the time it occurred." (Trial Tr., p. 120.)

{¶23} The discussion continued and the state inquired as to why Dr. Devies did not attempt to ask Appellant about the aspects of the incident that he remembered.

A   I'm interviewing him in the jail.  We were interrupted for a medication check.  And we're isolated.  I was not going to irritate him.  But the point is is [sic] that what he remembered would be suspect anyhow.  There's no real point in asking --

Q   Can you think of better evidence as to what his mental state was other than his memory?

A   The -- well, I would say his memory is suspect.  It didn't exist, he had problems prior to this, and it was not there at the time of an earlier examination and now he's being interviewed by another psychologist [Dr. Hart], how can I have any confidence in the memory that he produces?

(Trial Tr., pp. 121-122.)

{¶24}   The state asked Dr. Devies if he knew that Appellant had told the victim not to tell anyone and that it would be their secret.  Dr. Devies did not know of this fact, but did not believe that it was relevant.  He testified "[a]gain, I don't -- I believe that it's -- you're in error for taking any utterances on the part of a psychotic individual and trying to extrapolate the truth from it." (Trial Tr., p. 128.)

**{¶25}** Essentially, Dr. Devies believed that it was useless to evaluate Appellant's memory as he could not ensure that it was truly due to his restoration of memory and not the results of information Appellant learned after the fact. His testimony indicated that in his opinion it is impossible to determine, after the fact, whether a person knew his actions were wrong at the time of an incident. Dr. Devies repeatedly referred to the incident in this matter as an "irresistible impulse." (Trial Tr., p. 128.)

**{¶26}** Beth Brocker did not have a professional relationship with Appellant and knew him only as a family friend. She testified that she observed Appellant several days before the incident and believed that he was in a psychotic state. The court sustained an objection to this testimony. She also testified that she knew he had not been taking his medications at the time.

**{¶27}** Appellant's mother also testified as to his mental state. She explained that Appellant lived at her house and had a bedroom upstairs. However, he chose to sleep in what she described as less than ideal living conditions in the basement. She testified that he laid a blanket on the floor and surrounded it with knives because he thought people were out to get him. This area of the basement is not shown on the body camera footage. She testified that Appellant had been diagnosed with his mental illnesses around the age of 20 or 21. She stated that on occasion he asks to be taken to a hospital because he has "bad thoughts." (Trial Tr., p. 96.) She stated that he has been hospitalized for his conditions several times and has previously attempted suicide. She also described a violent altercation he had with his brother a few weeks before the incident when he attacked his brother and she had to hit Appellant with part of a vacuum cleaner to stop him.

{¶28} The most significant testimony came from the victim. She testified that Appellant kept looking out of the window during the incident. She also testified that he took her cell phone, which was located in the room where the rape occurred, and her house phone, which was located in the kitchen. She testified that he told her not to tell anyone what had happened because it was their secret. (Trial Tr., p. 27.)

{¶29} The fact that Appellant kept looking out the window during the rape and that it appeared he was checking to see if anyone was coming to the house was viewed by the trial court as strong evidence that Appellant knew what he was doing was wrong. Otherwise, Appellant would not have been concerned that his behavior was observed or interrupted. For similar reasons, the fact that Appellant told the victim not to tell anyone what had happened and that it was their secret also suggests that he knew what he was doing was wrong. These appear to be reasonable determinations.

{¶30} The record also reveals that after the victim's daughter spoke to police, she received several calls from Appellant. When she finally answered his call, she asked him if he took the victim's phones. He responded that it was a mistake but that he planned to return them the next day. Removing his grandmother's phones would obviously hinder her efforts to call for help. Further, it appears unlikely that a person would leave an almost 80-year-old woman who lives alone without a phone, particularly as Appellant lived not far away and did not have a reason why he did not immediately return the phones. It is hard to imagine that Appellant could accidentally take his grandmother's home phone, as she testified he was required to go into another room to get the phone. Testimony was offered that Appellant did not call his aunt often. After the incident, he called her several times over the course of a day until she finally answered, and it did not appear to his aunt

that he had an obvious purpose for calling repeatedly other than to determine whether she knew about the incident. This record supports the trial court's decision that Appellant knew his actions were wrong.

{¶31} Further, as stated by the trial court, Appellant's expert witness relied on old law in his testimony concerning irresistible impulses, which is no longer the standard in Ohio. The witness also had difficulty explaining why he did not ask Appellant about the incident when he claimed he had regained his memory of the day, first stating that he did not want to agitate Appellant and then that he could not trust Appellant's recollection. The witness also discounted evidence that Appellant took his grandmother's phones and warned her not to tell anyone. Appellant's witness also appeared to suggest that it was impossible to ever tell if someone knew right from wrong at the time of their actions and that information on this issue obtained from the subject afterward is necessarily tainted. We cannot say from this record that the trial court erred in finding this witness's testimony not to be credible. As such, Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES UPON THE APPELLANT CONTRARY TO LAW.

{¶32} While the state appears to interpret Appellant's argument as an attack on whether the trial court made the requisite R.C. 2929.14(C)(4) factors, it appears that Appellant is actually arguing that the trial court failed to consider mitigating evidence pertaining to his mental illness.

Case No. 21 MA 0066

**{¶33}** "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

**{¶34}** "A sentence is considered to be clearly and convincingly contrary to law if it falls outside of the statutory range for the particular degree of offense; if the trial court failed to properly consider the purposes and principles of felony sentencing as enumerated in R.C. 2929.11 and the seriousness and recidivism factors set forth in R.C. 2929.12; or if the trial court orders consecutive sentences and does not make the necessary consecutive sentence findings." *State v. Pendland*, 7th Dist. Mahoning No. 19 MA 0088, 2021-Ohio-1313, ¶ 41; citing *State v. Collins*, 7th Dist. Noble No. 15 NO 0429, 2017-Ohio-1264, ¶ 9; *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 30.

**{¶35}** The Ohio Supreme Court recently addressed review of felony sentences in *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649. The *Jones* Court clarified the standard of review for felony sentences that was previously announced in *Marcum*. The *Marcum* Court held "that R.C. 2953.08(G)(2)(a) compels appellate courts to modify or vacate sentences if they find by clear and convincing evidence that the record does not support any relevant findings under 'division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code.'" *Marcum*, *supra*, ¶ 22. The *Jones* Court did not overrule *Marcum* but clarified dicta to reflect that "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the

trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Jones*, *supra*, at ¶ 42.

**{¶36}** While the trial court in this matter made it abundantly clear that it does not appreciate the requirement to convey certain advisements to a defendant and to make certain findings on the record, the court did acknowledge Appellant's mental illness. However, because the judge found that Appellant knew right from wrong at the time of his actions, the court was obligated to sentence him as any other individual who knows right from wrong, regardless of his mental illness.

**{¶37}** We note that, "while mental health is a factor a trial court may consider when imposing a sentence, it is not the only factor for a court to consider." *State v. Linzey*, 7th Dist. Mahoning No. 19 MA 0041, 2021-Ohio-1994, ¶ 27, appeal not allowed, 164 Ohio St.3d 1433, 2021-Ohio-3091, 173 N.E.3d 514, ¶ 27; *See State v. Bishop*, 7th Dist. Jefferson No. 18 JE 0005, 2019-Ohio-4963, ¶ 41 (evidence regarding drug addiction is a factor that may be considered when determining a sentence but does not automatically reduce a sentence.) Thus, while a trial court may consider mental illness, it is not required to impose a lesser sentence based solely on this factor. Because Appellant's sentence is not contrary to law, Appellant's second assignment of error is without merit and is overruled.

## Conclusion

**{¶38}** Appellant challenges his conviction, arguing that it is against the manifest weight of the evidence as he believes he established the affirmative defense of not guilty by reason of insanity. Appellant also challenges his sentence, arguing that it is contrary

to law.  For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, P.J., concurs.

Robb, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**JUDGE CHERYL L. WAITE**

**JUDGE GENE DONOFRIO**

**JUDGE CAROL ANN ROBB**

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**