[Cite as *State v. Glover*, 2023-Ohio-1153.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220088 |
| | | TRIAL NO. B-2003890 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| TOMMY GLOVER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part and Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 7, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *Elizabeth Conkin*, for Defendant-Appellant.

**BOCK, Judge.**

{¶1} Tommy Glover appeals his convictions for six counts of aggravated robbery and five counts of kidnapping, all with firearm specifications, for robbing and kidnapping five different individuals at gunpoint. Raising six assignments of error, Glover challenges the trial court's ruling that the photo lineup was not unduly suggestive, admission of a videotape of him holding a gun and smoking marijuana, and the in-court identifications of Glover. He further argues that the convictions were based on insufficient evidence and against the manifest weight of the evidence. Finally, he contends that the record does not support the sentences imposed by the trial court. For the following reasons, we affirm the trial court's judgment in part, reverse the judgment in part, and remand the cause to the trial court.

## I.   FACTS AND PROCEDURE

{¶2} The state indicted Glover for a string of alleged robberies and kidnappings. It accused Glover of forcing Andrew Schuur to drive to various ATMs and withdraw cash on two occasions; robbing Janet McNamara of cash at gunpoint in her car and forcing her to drive for ten minutes; robbing Robert Matanguihan at gunpoint, taking his phone and car; and forcing Maya Bolander and Jacob Moretine, at gunpoint, to drive to ATMs and stealing $800 from Moretine's bank account.

### A. **Pretrial Motions**

{¶3} Glover moved to suppress a photo lineup identification made by McNamara, alleging that the lineup was unduly suggestive because her identification was based on having seen Glover's photo on the news following his arrest. Glover also filed a motion in limine to prohibit the state from showing the jury a video from Glover's cell phone of Glover holding a gun while smoking marijuana.

{¶4} McNamara was the sole witness at the hearing. She testified that she first met with police at the St. Bernard police station immediately after she was kidnapped and robbed. McNamara described the robber as a black male, wearing a maroon T-shirt, black shorts, and white gym shoes. She had a very good look at him— he was not wearing a mask and sat next to her in the passenger seat of her car for five to ten minutes. At that time, McNamara told the police that she was scared to death and just wanted to leave the station. A few months later, McNamara learned from a patient that a news piece discussed police arresting a suspect who had committed crimes similar to her experience. She called the police and agreed to view a photo lineup in August 2020. After viewing the lineup, McNamara identified Glover as the person who had robbed her.

{¶5} At the hearing, McNamara testified that she had never seen Glover's photo before the lineup and had not seen his photo on the news. When she initially saw his photo, she was afraid because she knew it was him. McNamara confirmed that an officer noted in the lineup page that McNamara was "visibly stressed, scared, and worried about stating 100% certainty." McNamara wrote that she was "100% certain that he is the one." The trial court overruled Glover's motion to suppress.

{¶6} Turning to the motion in limine, Glover sought to prohibit the state from playing a video from his phone of Glover wearing a black jacket with a reflective stripe on the arm, smoking marijuana, and holding a gun. Glover argued the video was more prejudicial than probative. In response, the state maintained that the cell phone video linked Glover to the Schuur robbery and submitted still photos from an ATM video of the robbery. In the photos, Schuur's assailant is seen wearing a jacket that appeared to match the jacket from Glover's video. Ultimately, the court determined that the

probative value of identifying Glover "in a very distinctive jacket" outweighed any prejudice and overruled the motion in limine.

**B. The Bench Trial**

1) *Schuur Robberies*

{¶7}    At the bench trial, Schuur testified that he was robbed on two separate occasions. Schuur recalled that in May 2020, he was walking in his neighborhood when two men asked him for directions. Schuur identified Glover as one of the men. According to Schuur, Glover held him at gunpoint while the other man stole his wallet. Schuur described being forced into the driver's seat of his car and Glover instructing him to drive to three different ATMs, where Schuur withdrew $500, $500, and $300. Glover told Schuur to drive across town and fled at a stop sign. Based on his 45-minute encounter, Schuur described Glover as a heavy-set black male with short hair and facial hair, dressed in a hooded sweatshirt and jacket.

{¶8}    Then, about a month later, Schuur was walking to his car when a man wearing a black mask and a green shirt approached him with a gun. Schuur believed it was the same man from the May robbery, recognizing his voice and body-type. Again, Schuur was forced to drive to ATMs and withdrew $500, $500, and $300. Schuur was with Glover for 20-25 minutes.

{¶9}    In July 2020, police showed Schuur a lineup but he could not positively identify anyone as his assailant, despite a slight resemblance in two photographs. In August 2020, police showed Schuur another lineup. This time, he was 90 percent certain that Glover was the perpetrator. The second photograph resembled his assailant, but Schuur was only 30 percent confident in his identification. While two other photos resembled his kidnapper, he was only 50 percent confident in those

identifications. Schuur wrote, "There was one that I'm almost certain is the guy, and others I am not so certain about." But in court, Schuur identified Glover with 100 percent certainty.

{¶10}  Detective Keith Ingram of the St. Bernard Police Department testified that, as the primary investigator, he retrieved video and still photographs from a PNC Bank ATM where Schuur was robbed. In the photos and video, Schuur can be seen withdrawing money as he stood next to a man with a black-hooded sweatshirt with reflective embossing on the sleeves.

{¶11}  In his investigation, Ingram learned that Glover was arrested in August for robberies in Norwood, Ohio. Police recovered three cell phones from Glover. After forensic testing, cell phone location data ("pings") placed Glover in the area of both Schuur robberies. Indeed, the pings showed Glover walking the location in St. Bernard where Schuur was kidnapped in May and placed Glover in the area where Schuur dropped off the robber in June. The police also recovered a small bag and a video from Glover's phone. The video showed Glover wearing the same sweatshirt depicted in the ATM photos. Over objection, the state played the video.

2) *McNamara Robbery*

{¶12}  McNamara testified that in June 2020, when she left work and got into her car, two men approached her car and opened her passenger-side doors. She recalled a heavy-set black man with short black hair and facial hair getting into the front seat and demanding money at gunpoint.[1] McNamara testified that she "will never forget his face." As he rifled through her purse, McNamara begged for her life. He took $10-$15 from her wallet and demanded she drive to an ATM, despite McNamara

---

[1] McNamara testified that the second man never entered her car.

5

telling him there was no money in her account. After ten minutes, he fled.

{¶13} Immediately afterwards, McNamara, now terrified, met with the St. Bernard police but, in her frightened state, she was not able to identify the man who robbed and kidnapped her. In August, she returned to view a photo lineup and identified Glover with 100 percent certainty. McNamara also identified Glover in court as her robber.

{¶14} Detective Ingram testified that a St. Bernard police related-incidents document described a July phone call from McNamara where she informed police that she recognized the man who robbed her from a Channel 12 news report.

3) *Norwood Robberies*

{¶15} Robert Matanguihan testified that he was accosted near his car in Norwood by two men. According to Matanguihan, one of the two men was heavy-set and appeared to give orders to the younger, skinnier man. Both had guns and threatened to shoot Matanguihan. They demanded money, his phone, his car keys, and his bank card. After learning that Matanguihan had no money and his bank account was overdrawn, they stole his Chevy Aveo, which was eventually recovered a block from his home with no damage to the car and nothing missing. The encounter lasted roughly three minutes. Matanguihan was unable to identify the perpetrators from a photo lineup or in court.

{¶16} Shortly after Matanguihan's car was stolen, Jacob Moretine and Maya Bolander were parked outside of Moretine's house when two men emerged and approached their car. One man wore a facemask with clown print and carried a bag. The other man was thinner.

6

**{¶17}** The men forced Moretine and Bolander, at gunpoint, into Moretine's car and forced Moretine to drive. Moretine recalled Glover tossing a cell phone out of the car window during the drive. According to Moretine, Glover and his partner were laughing about robbing another man of his cell phone near Moretine's house.

**{¶18}** Over the course of two hours, the men forced Moretine to drive to three ATMs. Glover accompanied Moretine to the first two ATMs while Glover's partner held Bolander at gunpoint. While Glover was able to withdraw money from Moretine's account at the first two ATMs, he was unable to withdraw money from Bolander's account at the third. Glover demanded that Moretine drive to Avondale, where Glover and his partner took Bolander's and Moretine's cell phones and fled.

**{¶19}** Moretine and Bolander provided to police descriptions of the perpetrators, which matched Matanguihan's. In particular, Moretine described the perpetrator as a heavy-set man with spiderwebs tattooed on his hands, wearing a face mask decorated with clown print. Moretine confirmed that a photo of Glover's hands depicted the tattoos he saw.

**{¶20}** Moretine and Bolander were unable to positively identify anyone from a photo lineup. While Moreline was not 95 percent certain, Moretine did recognize Glover from his photo. But in court, Moretine identified Glover as the perpetrator with 100 percent certainty. And when shown a photo lineup, Bolander identified another man as the perpetrator with 90 percent confidence. But in court, she identified Glover as the gunman.

4) *The Norwood Investigation*

**{¶21}** Sergeant Matt Klingelhoffer from the Norwood Police Department was assigned to investigate the robberies. He reached out to Detective Ingram after

learning about the St. Bernard robberies. In each case, the suspect descriptions were similar.

**{¶22}** Two of the banks where Moretine had been forced to stop provided Klingelhoffer photos from their ATMs. The photos showed the suspect wearing a clown face mask and a blue hoodie, with a black Nike bag worn across his chest.

**{¶23}** A little more than a month later, in August 2020, a Norwood resident had reported that she and her husband became uncomfortable after seeing a man wearing a face mask and a Nike bag slowly walking down Williams Avenue. Officers dispatched to the scene found Glover nearby. When the officers asked to speak with Glover, he briefly fled before being taken into custody. They released him at the scene.

**{¶24}** After comparing the body-camera footage from August 2020 with the ATM photos, Klingelhoffer concluded that Glover was the person in the ATM photos.

**{¶25}** Officer Robert Wilsman of the Cincinnati Police Department testified that he responded to a report of a possible robbery suspect walking down Reading Road in August 2020. When Wilsman spotted Glover and exited from his car, Glover fled before he was ultimately arrested. The state played Wilsman's body-camera footage in court, which showed Glover wearing the Nike bag.

**{¶26}** While in jail, Glover made phone calls. In one, Glover asked the other person on the line, "Do they have my face on there?"

5) *Glover's testimony*

**{¶27}** Glover testified that he did not commit any of the crimes. Glover admitted that the person in the ATM photo had a Nike bag similar to his and wore it in a similar fashion, but denied that was him. Glover also admitted that he owned a black hooded sweatshirt with metallic stripes. He agreed that his sweatshirt was the

same brand as the one in the photo, and that they looked similar, but pointed out a red liner on the inside of the hoodie in the photograph. Finally, Glover testified that each in-court identification was a lie.

6) *The Verdicts and Sentences*

**{¶28}** The trial court found Glover guilty of six counts of aggravated robbery in violation of R.C. 2911.01(A)(1), and five counts of kidnapping in violation of R.C. 2905.01(A)(2), with each count carrying two penalty-enhancing gun specifications. The court found that the same person committed the offenses due to the similar modus operandi, methodology, physical descriptions, location proximity, and attempt to get money from ATMs.

**{¶29}** Beginning with the Schuur robberies, Schuur identified Glover with 90 percent certainty when shown a photo lineup, his in-court identification was credible, and the perpetrator's jacket in the ATM photo matched the jacket worn by Glover in his cell-phone video. Turning to the McNamara robbery, her identification of Glover was believable and credible. The offenses occurred in the same area as the offenses against Schuur with the same modus operandi. While Matanguihan could not identify Glover, his car and phone were stolen, and his car was immediately discarded one street away from the location where Glover encountered Bolander and Moretine. And Bolander's and Moretine's in-court identifications and testimonies were credible. Plus, the ATM photos clearly depicted Glover. Glover was also identifiable by the Nike bag and tattoos. In addition, the trial court cited Glover's attempt to flee from the police and jail call admission.

**{¶30}** During the mitigation portion of the sentencing hearing, Glover requested an aggregate 12-to-15-year sentence, citing the lack of physical harm to the

victims and his lack of prior felony convictions. Based on the victims' and officers' wishes, the state recommended a 20-to-25-year sentence. The presentence-investigation report stated that Glover was adjudicated delinquent as a juvenile for Toledo's Safe School Ordinance, but did not include any facts underlying that adjudication. *See* Toledo Municipal Code 537.16.

**{¶31}** The trial court found that consecutive sentences were necessary to protect the public and punish the offender and not disproportionate to the conduct. The court further found that the harm caused by two or more of the offenses was so great or unusual that no single prison term adequately reflected the seriousness of Glover's conduct. Finally, the court found that the offenses were committed as part of a course of conduct, and Glover's criminal history, which "shows violence in school," demonstrated that consecutive sentences were necessary to protect the public.

**{¶32}** The trial court sentenced Glover to seven years on each underlying felony and three years on each gun specification, with each specification to be served consecutively and before the sentences imposed on the underlying offenses. The sentences for the aggravated robbery counts were to be served consecutively to each other and the kidnapping sentences were to be served concurrently to each other and the other sentences, for an aggregate term of 60 years' incarceration.

## II. LAW AND ANALYSIS

### A. McNamara's lineup identification was admissible

**{¶33}** In his first assignment of error, Glover contends that the trial court violated his due-process rights by denying his motion to suppress McNamara's identification.

**{¶34}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71,

¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by some competent, credible evidence. *Id*. Accepting those facts as true, the appellate court must then independently determine, without deference to the trial court's judgment, whether the facts satisfy the applicable legal standard. *Id*.

**{¶35}** "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**{¶36}** The defendant must demonstrate that the lineup was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. "When the questionable circumstances of an identification procedure are not due to state action, the reliability of the identification is a question going to the weight of the testimony, not its admissibility." *Id*. at ¶ 209.

**{¶37}** Glover argues that McNamara's identification was tainted because she saw his mugshot on the news. To support this assertion, Glover relies on the police report written by an unnamed St. Bernard police officer. The report memorialized a phone call from McNamara to the St. Bernard police in which, according to the report, she stated that she saw the person who had robbed her on a Channel 12 news story.

**{¶38}** But McNamara testified at the suppression hearing that she had not seen any news reports about Glover. Instead, McNamara testified that one of her patients had seen a news report and informed her that the police had arrested someone for committing crimes similar to the crime committed against her.

**{¶39}** Glover makes no showing that the state employed an unduly suggestive procedure. Because the lineup was not unduly suggestive, it was admissible. The identification's reliability was an issue for the trier of fact to decide. *See State v. Savage*, 1st Dist. Hamilton No. C-180413, 2019-Ohio-4859, ¶ 36. We overrule Glover's first assignment of error.

## B. The trial court properly admitted the video of Glover

**{¶40}** Glover's second assignment of error asserts that the trial court erred in admitting video evidence of him holding a gun and smoking marijuana.

**{¶41}** Evid.R. 404(B)(1) prohibits evidence of a defendant's other acts when its only purpose is to show the defendant's propensity or character to commit crimes. Evid.R. 404(B)(2) allows evidence of the defendant's other crimes, wrongs, or acts to be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.." The admissibility of other-acts evidence is a question of law that this court reviews de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. But we review the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant for an abuse of discretion. *Id.* at ¶ 30.

**{¶42}** To determine whether other-acts evidence is admissible, the first step is to determine whether the evidence is relevant to the particular purpose for which it is offered and whether it is relevant to an issue in dispute. *Id.* at ¶ 26-27. If the evidence passes the relevancy test, the final step is to consider whether the value of the evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Id.* at ¶ 29.

**{¶43}** The state sought to admit the video from Glover's phone to establish the identity of the person who kidnapped and robbed Schuur. The perpetrator's identity was a material issue in this case and the video depicted Glover wearing a distinctive jacket that appeared to match the jacket worn by the individual who kidnapped and robbed Schuur. Thus, the evidence was relevant to identity, the particular purpose for which it was offered.

**{¶44}** Next, this court must determine whether the evidence's probative value was substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A). Probative evidence is subject to exclusion where the evidence "might result in an improper basis for a jury decision," such as where "the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish[.]" *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 125. But because this was a bench trial, "we presume that the court considered only 'relevant, material and competent evidence' unless the record affirmatively discloses otherwise." *State v. Pennington*, 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 46, quoting *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987).

**{¶45}** Before admitting the video, the trial court acknowledged the prejudicial effect of the gun but found that "the identifying features of the jacket outweighs the prejudice." We presume that the trial court did not consider improper evidence in reaching its verdict. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 39. The record contains no evidence that the trial court improperly considered the gun or the marijuana in reaching its verdict. Therefore, we overrule Glover's second assignment of error.

## C. **Witnesses' in-court identifications were not unduly suggestive**

**{¶46}** Glover's third assignment of error asserts that the victims' in-court identifications were unduly suggestive and unreliable because the identifications were influenced by the fact that he was the only heavy-set black man wearing a jail jumpsuit in the courtroom when the identifications were made. Glover further contends that the admission of the identifications was plain error that affected the outcome of the trial and resulted in a manifest miscarriage of justice.

**{¶47}** Glover acknowledges that he did not object to the in-court identifications and that his claim is subject to a plain-error review. To prevail on a plain-error claim, an accused must show that an error occurred, that the error was plain, and that the error affected the outcome of the trial. *See* Crim.R. 52(B). A reviewing court should employ the "utmost caution" and find plain error only "under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶48}** "An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Whether the Due Process Clause requires a trial court to suppress an eyewitness identification involves a two-step inquiry. *State v. Stidhum*, 1st Dist. Hamilton No. C-170319, 2018-Ohio-4616, ¶ 36 (finding that a witness's in-court identification was admissible). First, the defendant must establish that the identification procedure used by the state was "both suggestive and unnecessary." *Id.* If there is no showing that the state employed an unnecessarily suggestive procedure to obtain the identification, then the unreliability of the identification alone will not preclude its admission at trial. *Id.* at ¶ 38. "Instead, such unreliability should be exposed through the rigors of cross-

examination at trial and the protections built into the adversary system, such as the right to the effective assistance of counsel, the right to confront the witness, and the rules of evidence." *Id.* "Therefore, in-court identifications, where there has been no prior unlawful or unnecessarily suggestive police conduct, are properly admitted." *State v. Berry*, 10th Dist. Franklin No. 18AP-9, 2019-Ohio-3902, ¶ 25.

{¶49} To the extent that Glover argues that when identity is an issue in a case, in-court identifications are inherently suggestive and unreliable, he cites to no controlling legal authority to support this contention. Moreover, Glover made no showing that the procedure employed by the state was unduly suggestive.

{¶50} Glover has not shown that the trial court's admission of the witnesses' in-court identifications amounted to error, much less plain error. As such, any unreliability of the in-court identifications was an issue of weight, not admissibility. We overrule the third assignment of error.

## D. **The convictions were supported by sufficient evidence and not against the manifest weight of the evidence**

{¶51} In his fourth and fifth assignments of error, which he argues together, Glover contends that his convictions were based on insufficient evidence and contrary to the manifest weight of the evidence.

{¶52} A challenge to the sufficiency of the evidence presents this court with a question of law that we review de novo. *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 15, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The test for determining the sufficiency of the evidence is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v.*

*MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

**{¶53}** In reviewing a weight-of-the-evidence claim, we review " 'the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *Bailey* at ¶ 63.

**{¶54}** Glover challenges the reliability of his identification as the perpetrator because the clothing identified by the victims was different in each offense, the locations were different, the number of perpetrators and their locations in the cars were different, the face coverings were different, the presence of tattoos was different, the identifications were inconsistent or wrong, the ATM photos and video were blurry, and there was no fingerprint or DNA evidence that connected Glover to the crimes.

**{¶55}** Glover generally challenges the state's proof, citing the lack of physical evidence such as fingerprints or DNA test results. But the state is not required to present physical evidence to meet its burden of proof. *See State v. Jeffries*, 2018-Ohio-2160, 112 N.E.3d 417, ¶ 72 (1st Dist.) (concluding that "the state is not required to present corroborating DNA test results or other corroborating physical evidence to meet its burden of proof, even in a rape case."); *State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 67 (finding that the record contained more than sufficient

evidence in the form of witness testimony to sustain the charges against the defendant).

{¶56} We find that the state's evidence sufficiently supported the convictions. Two witnesses identified Glover before trial. Two other witnesses identified Glover at trial. The fifth victim could not identify Glover, but his car was recovered near where the next two victims were robbed and kidnapped. The modus operandi of the crimes was similar, as were the descriptions of the perpetrators. This evidence was sufficient to support Glover's convictions.

{¶57} Glover further argues that the trial court erred in weighing the evidence, clearly lost its way, and created a manifest miscarriage of justice because the witness identifications were unreliable. "It is well settled that the responsibility of weighing the credibility of a witness rests with the fact-finder." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 6.

{¶58} The trial court, as the finder of fact, was entitled to believe all, some, or none of the witnesses' testimony. *State v. Simmons*, 2017-Ohio-1348, 88 N.E.3d 651, ¶ 35 (10th Dist.). The trial court heard the testimony and found the witnesses' testimony to be credible. There is nothing in the record to suggest that the trial court clearly lost its way and created such a manifest miscarriage of justice as to warrant reversal. This is not one of those rare, exceptional cases in which the evidence weighs heavily against conviction. Accordingly, we overrule the fourth and fifth assignments of error.

**E. The record does not support six consecutive sentences**

{¶59} In his sixth assignment of error, Glover, who was 23 years old at the time of sentencing, asserts that the record does not support the trial court's imposition

of consecutive sentences, for an aggregate sentence of 60 years, which is tantamount to a life sentence.

{¶60} Before trial, the state offered Glover a 15-year prison term in exchange for a guilty plea. Glover declined, instead choosing to exercise his constitutional right to a jury trial. After trial, the prosecutor told the trial court, "At a minimum I do not think that whatever sentence the Court imposes for each victim should run consecutive with each other. These were separate incidents, separate dates." And the state, based on the victims' and officers' wishes, recommended a sentence of between 20 and 25 years.

{¶61} We agree with the state's position at trial and with Glover. Because we clearly and convincingly find that the record does not support the trial court's findings involving the proportionality of Glover's aggregate sentence to the seriousness of his conduct and the danger he poses to the public, we sustain Glover's sixth assignment of error.

1) *The record must support imposition of consecutive sentences*

{¶62} Ohio law contains a statutory presumption of concurrent sentences for defendants convicted of multiple offenses. *State v. Galinari*, 1st Dist. Hamilton No. C-210149, 2022-Ohio-2559, ¶ 9. "The general principle set forth in the Revised Code is that concurrent sentences are the default and consecutive sentences are the exception." *State v. Hitchcock*, 157 Ohio St.3d 215, 2019-Ohio-3246, 134 N.E.3d 164, ¶ 21.

{¶63} "Consecutive sentences are reserved for the worst offenses and offenders." *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, ¶ 21,

*abrogated on other grounds*, *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph three of the syllabus (statutorily-mandated judicial factfinding violated defendants' right to a jury trial).

**{¶64}** Because consecutive sentences are the exception and should be reserved for the most serious offenders and offenses, the legislature requires a sentencing court to make the mandatory sentencing findings prescribed by R.C. 2929.14(C)(4). *See Galinari* at ¶ 9, citing *State v. McKinney*, 1st Dist. Hamilton No. C-210276, 2022-Ohio-849, ¶ 11. A trial court must make three distinct findings: 1.) "the consecutive service is necessary to protect the public from future crime or to punish the offender;" 2.) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and 3.) one or more of R.C. 2929.41(C)(4)'s subsections apply. R.C. 2929.14(C)(4).

**{¶65}** Relevant here, R.C. 2929.41(C)(4)'s subsections require the court to find that either 1.) two or more offenses were committed as part of a course of conduct and the harm caused by the offenses was so great or unusual that a single prison term cannot adequately reflect the seriousness of the offender's conduct; or 2.) the offender's criminal history demonstrates that consecutive sentences are needed to protect the public from the defendant committing future crimes. R.C. 2929.41(C)(4)(b) and (c).

**{¶66}** To determine compliance with R.C. 2929.14(C)(4), we examine whether: 1.) the trial court engaged in the correct analysis, and 2.) the record contains evidence to support the trial court's findings. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. The trial court must state the required findings at the sentencing hearing and incorporate those findings into the sentencing entry. *Id.*

There is no dispute that the trial court made the requisite findings. Instead, Glover's argument on appeal is that the record does not support the trial court's findings.

2) *Ohio law permits appellate courts to modify imposition of consecutive sentences that are clearly not supported by the record*

**{¶67}** Appellate review of consecutive sentences is governed by R.C. 2953.08(G)(2). *See State v. Marshall*, 1st Dist. Hamilton Nos. C-190748 and C-190758, 2021-Ohio-816, ¶ 48, citing *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.3d 169, ¶ 16.

**{¶68}** R.C. 2953.08(G)(2) does not permit appellate courts to weigh the evidence and alter a sentence under R.C. 2929.11 and 2929.12. *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 42. Consecutive sentences, however, being the exception to the general rule, are treated differently.

**{¶69}** This court may modify or vacate a trial court's decision to impose consecutive sentences if we, after reviewing the record, clearly and convincingly find that "the record does not support the sentencing court's findings" under R.C. 2929.14(C)(4). R.C. 2953.08(G)(2)(a). Put another way, this court may vacate or modify the trial court's sentence only "if, upon review of the record, the court is left with a firm belief or conviction that the findings are not supported by the evidence." *Gwynne* at ¶ 27.

**{¶70}** Recently, the Supreme Court of Ohio considered two questions involving consecutive sentences: 1.) under what standard should an appellate court review the imposition of consecutive sentences; and 2.) are courts required to "consider the overall aggregate prison term to be imposed when making [R.C.

2929.14(C)(4)] consecutive-sentence findings." *State v. Gwynne*, Slip Opinion 2022-Ohio-4607, ¶ 1.[2]

**{¶71}** Regarding the first question, the *Gwynne* majority held that an appellate court should review imposition of consecutive sentences de novo. *Id.* The dissent, however, noted that " '[o]rdinarily, appellate courts defer to trial courts' broad discretion in making sentencing decisions,' and R.C. 2953.08(G) reflects that deference." *Id.* at ¶ 52, quoting *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 10. As will be discussed in detail below, even under a deferential standard of review, we find that the trial court's imposition of a 60-year aggregate sentence was error because we hold a firm belief that the record does not support the trial court's findings.

**{¶72}** Regarding whether a court must consider the aggregate sentence when making the statutory consecutive-sentences findings, the *Gwynne* majority answered affirmatively. *Id.* at ¶ 1. And while the dissent disagreed that a court *must* make findings in considering the aggregate term, it agreed that a trial court considers the aggregate sentence: "The only reasonable interpretation of R.C. [2929.14(C)(4)] is that when a trial court is imposing multiple prison terms, it may order a defendant to serve **some or all** of those prison terms consecutively if it makes the statutory findings established by the legislature. * * * When a trial court orders a defendant to serve multiple consecutive prison terms, of course it knows the amount of time that it has sentenced the defendant to serve." (Emphasis added.) *Id.* at ¶ 67, 70 (Kennedy, J., dissenting).

---

[2] We note that the state moved for the Supreme Court of Ohio to reconsider its decision in *Gwynne*. As of the date of this decision, the court has not ruled on the state's motion.

**{¶73}** Under the interpretations provided by both the majority and the dissent in *Gwynne*, if the sentencing court makes the requisite R.C. 2929.14(C)(4) findings, it may order *some* of the sentences be served consecutively or *all* of the sentences be served consecutively. Thus, while the majority and dissent in *Gwynne* disagreed about whether a trial court *must* consider the aggregate sentence, they appeared to agree that a court *can* consider the aggregate sentence when determining whether to impose consecutive sentences and if so, how many of the prison terms should be served consecutively.

**{¶74}** A trial court, when imposing consecutive sentences, may look to the aggregate sentence to determine if it is disproportionate to the offender's criminal history and offenses. Once a court decides to impose consecutive sentences, it need not stack all of the sentences. Instead, if it runs sentences consecutively, it should stack those sentences such that the sentence is proportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.

3) *Statutory and case law demonstrate that crimes causing physical harm receive longer sentences*

**{¶75}** As stated above, the Ohio Supreme Court has held that "consecutive sentences are reserved for the worst offenses and offenders." *Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, at ¶ 21. And crimes that cause physical and emotional harm, rather than only emotional harm, generally receive longer sentences. For example, the penalty for aggravated murder under R.C. 2903.01 ("No person shall purposely, and with prior calculation and design, cause the death of another or the

unlawful termination of another's pregnancy.") is a minimum of life in prison to a maximum of death. The penalty for murder under R.C. 2903.02 ("No person shall purposely cause the death of another * * * .") is an indefinite term of 15 years to life. R.C. 2929.02(B)(1). Rape of a child aged ten or younger carries a maximum term of life without parole. R.C. 2907.02. And when a defendant is convicted of a violent sex offense with a sexually-violent-predator specification, subject to some exceptions, the court must impose an indefinite prison term of 25 years to life. R.C. 2971.03(A)(3)(d)(1).

{¶76} Moreover, the penalties for violent crimes are enhanced when the victim suffered serious physical injury. For example, R.C. 2921.331, which prohibits a person from failing to comply with a lawful order of a police officer, is a misdemeanor or a fourth-degree felony in all cases except when the offender's behavior either proximately caused, or carried a substantial risk of causing, serious physical harm to persons or property. R.C. 2921.331(C). And R.C. 2919.22, which prohibits endangering children, is a misdemeanor if the offender has not previously been convicted of an offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child. R.C. 2929.331(C)(2)(a)-(b). But the offense is enhanced for all offenders, regardless of prior convictions, to a second- or third-degree felony if the offense results in serious physical harm to the child. R.C. 2929.331(C)(2)(c)-(d). And the statute prohibiting child rape is enhanced for several reasons, including if the offender caused serious physical harm to the victim. R.C. 2907.02.

{¶77} A selection of Ohio cases in which the offender was convicted of crimes that caused both physical and emotional harm, such as rape, sexual conduct with minors, murder, attempted murder, and assault, shows that while courts impose

lengthy sentences, many are shorter than 60 years. *E.g.*, *State v. McRae*, 1st Dist. Hamilton No. C-180669, 2020-Ohio-773, ¶ 5 (court sentenced defendant on two counts of attempted murder of police officers, two counts for having a weapon while under a disability, one count of carrying a concealed weapon, and assault; his aggregate sentence was 43.5 years); *State v. Patton*, 1st Dist. Hamilton No. C-190694, 2021-Ohio-295, ¶ 2 (defendant convicted of two counts of murder with specifications; aggregate sentence was 24 years to life); *State v. Prescott*, 8th Dist. Cuyahoga Nos. 107784 and 107789, 2019-Ohio-5114, ¶ 2 (defendant convicted of 14 counts each of aggravated robbery and kidnapping, all with gun specifications, for eight separate events; one victim was pistol whipped, causing serious injuries, and another victim was punched in the face; court imposed aggregate 25-year sentence); *State v Washington*, 6th Dist. Lucas No. L-19-1190, 2021-Ohio-760, ¶ 4, 10, 15 (trial court sentenced defendant who brutally raped and assaulted two women to aggregate 28-year sentence); *State v Corey*, 11th Dist. Geauga No. 2021-G-0029, 2022-Ohio-4568, ¶ 15 (defendant who shot victim four times was convicted of attempted murder, firearm specifications, and tampering with evidence; trial court sentenced him to aggregate term of ten-15 years); *Galinari*, 1st Dist. Hamilton No. C-210149, 2022-Ohio-2559, at ¶ 2, 4 (defendant attacked a teenager and an adult with an aluminum bat; trial court sentenced him to an aggregate 13-year term); *Ohio v. Jones*, 2d Dist. Montgomery No. 28977, 2021-Ohio-3050, ¶ 1 (defendant broke into three women's homes, raped two of the women by gunpoint, and forced one to take fentanyl; after jury convicted the defendant of aggravated burglary with a deadly weapon, aggravated burglary causing physical harm, two counts of rape, two counts of kidnapping, and one count of aggravated robbery with a deadly weapon, the court sentenced him to an

aggregate term of 39 years); *State v. Polizzi*, 166 Ohio St.3d 1504, 2022-Ohio-1606, 187 N.E.3d 552, ¶ 36 (defendant-teacher was convicted of gross sexual imposition and six counts of sexual battery for inappropriate relationships with his high school students; appellate court found that 33-year sentence would demean the seriousness of more serious crimes, such as rape and murder); *State v. Consiglio*, 7th Dist. Mahoning No. 21 MA 0066, 2022-Ohio-2340, ¶ 1-2 (defendant convicted of rape, attempted rape, aggravated robbery, robbery, theft from a person in a protected class, and domestic violence against his 79-year-old grandmother, plus assaulting a police officer; court merged allied offenses and sentenced him to indefinite term of 19.5 to 25 years' incarceration); *State v. Steele*, 5th Dist. Delaware No. 21 CAA 11 0061, 2022-Ohio-712, ¶ 1 (court sentenced defendant convicted by a jury of five counts of unlawful sexual conduct with a minor, two counts of rape, and one count of gross sexual imposition to an aggregate prison term of 22 years).

{¶78} A review of cases in which a defendant was convicted of crimes that caused emotional trauma, but no or minimal physical harm, showed that courts often impose significantly shorter sentences than 60 years, even when there are multiple offenses and victims. *See, e.g., State v. Pattson*, 2d Dist. Montgomery Nos. 29028 and 29029, 2022-Ohio-150 (defendant who broke into a home and threatened to kill at gunpoint the two adults and their young children, shot the family's puppy, and forced the woman by gunpoint to drive her vehicle to an ATM to withdraw cash, stole her car, and left her in an alley, was convicted of aggravated burglary, two counts of aggravated robbery, one count of kidnapping, one count of having weapons under a disability, two counts of aggravated menacing, one count of cruelty to a companion animal, and one count of grand theft; the trial court imposed an indefinite sentence of 12 to 15 years);

*State v. Cremeans*, 5th Dist. Muskingum No. CT2015-0062, 2016-Ohio-7930 (a defendant with multiple prior convictions for violent offenses received an aggregate 30-year sentence for multiple counts of aggravated burglary, kidnapping, aggravated robbery, and having weapons under a disability after he entered the home where three adults and four children were present, waved guns around, threatened an adult, and tied up two children and two adults); *State v. Justice*, 2d Dist. Montgomery No. 23744, 2010-Ohio-6484 (defendant was found guilty of four counts of aggravated robbery, five counts of aggravated burglary, four counts of kidnapping, and two counts of having weapons under disability, some charges with firearm specifications; court sentenced him to a seven-year prison term); *State v. Rogers*, 8th Dist. Cuyahoga No. 92380, 2009-Ohio-5490 (defendant convicted of three counts of aggravated burglary, with one- and three-year firearm specifications, and three counts of kidnapping, with one- and three-year firearm specifications, for taking money from four victims at gunpoint; trial court imposed aggregate six-year prison term).

**{¶79}** Under this backdrop, we turn to whether, after reviewing the record, we clearly and convincingly find that the record does not support the trial court's findings under R.C. 2929.14(C)(4).

4) *The record clearly and convincingly does not support the trial court's findings under R.C. 2929.14(C)(4)*

**{¶80}** Glover argues that his aggregate sentence is excessive and the trial court's R.C. 2929.14(C)(4) findings were not supported by the record. The trial court ran consecutively Glover's six aggravated-robbery sentences (seven years each) and each underlying charge's gun specification (three years each), for an aggregate 60-year

26

sentence. The trial court told Glover that "[t]he sentence I've imposed is the sentence you will serve without any good-time reduction."

**{¶81}** As discussed above, a trial court, before imposing consecutive sentences, must find all three of the R.C. 2929.14(C)(4) factors. Therefore, if a reviewing court determines that the record clearly and convincingly does not support any one of the three findings, it must modify the aggregate sentence.

**{¶82}** Here, the trial court stated that the sentences were "consecutive to each other because one sentence is really not sufficient for the crime that you committed." It found that the sentence "is most appropriate to punish you for the crimes that you did." It noted that Glover had not taken responsibility and was not amenable to change.

**{¶83}** Next, the court found that Glover had committed two or more offenses as part of a course of conduct and the harm caused was so great or unusual that no one term would reflect the seriousness of Glover's conduct. It also found that Glover had a criminal history of violence in school.

**{¶84}** Finally, regarding proportionality, the trial court stated, "I feel that you do have a criminal history which shows violence in school. And I do feel that I need to protect the public. And I do feel [it's] necessary to protect the public, and to punish the offender, and it is not disproportionate to the seriousness of the offender's conduct and danger the offender poses to the public." The trial court discussed the fact that Glover did not live in Hamilton County, did not appear to be supporting his children, was unemployed, and showed no remorse.

**{¶85}** We hold that the trial court's findings involving proportionality under R.C. 2929.14(C)(4) and criminal history under R.C. 2929.14(C)(4)(c) were clearly and

convincingly not supported by the record.[3] While we believe that Glover's conduct was serious and caused his victims significant emotional trauma, his conduct does not justify imposing consecutive sentences on all the aggravated robbery charges and specifications, for an aggregate 60-year sentence. Imposing a sentence akin to life in prison on a 23-year-old man, under the facts and circumstances in this case, clearly was not supported by the record.

5) *The trial court's 60-year sentence was disproportionate to Glover's past conduct and offenses*

{¶86} Before imposing consecutive sentences, R.C. 2929.14(C)(4) requires the trial court to find "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public * * * ."

{¶87} A proportionality analysis considers both the defendant's current conduct and the risk of the defendant being a danger in the future. R.C. 2929.14(C)(4). To make that determination, the analysis "focuses upon the defendant's current conduct and whether this conduct, in conjunction with the defendant's past conduct, allows a finding that consecutive service is not disproportionate." *State v. Crim*, 2d Dist. Clark No. 2018-CA-38, 2018-Ohio-4996, ¶ 11; *State v. Mathis*, 6th Dist. Lucas No. L-21-1249, 2022-Ohio-4020, ¶ 19 (same); *State v. Forsell*, 11th Dist. Portage Nos. 2019-P-0116, 2019-P-0117, 2019-P-0118, 2019-P-0119, 2019-P-0120, 2019-P-0121, 2019-P-0122, 2019-P-0123 and 2019-P-0124, 2020-Ohio-5381, ¶ 26 (same).

---

[3] Because the trial court also found that Glover committed two or more offenses as part of a course of conduct causing harm so great or unusual that a single prison term was inadequate to reflect the seriousness of Glover's offenses and because, as will be discussed below, proportionality findings involve considering both past and current conduct, we will discuss the trial court's findings regarding Glover's criminal history in our discussion about proportionality.

### a. *Glover's juvenile adjudication*

**{¶88}** "Quite simply, a juvenile adjudication is not a conviction of a crime and should not be treated as one." *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, ¶ 38. Despite that general rule, Ohio law allows a trial court to view offenders' juvenile history as part of their criminal history when imposing consecutive sentences. *State v. Batiste*, 2020-Ohio-3673, 154 N.E.3d 1220, ¶ 20 (8th Dist.). But "use of an offender's juvenile criminal history is generally reserved for instances where the offender has an extensive juvenile history." *Id.*; *see State v. Jones*, 8th Dist. Cuyahoga No. 111208, 2022-Ohio-4202, ¶ 32 (same).

**{¶89}** The trial court not only used Glover's single juvenile adjudication in its consideration of his past criminal acts, but also misinterpreted the ordinance under which Glover was adjudicated delinquent.

**{¶90}** Glover was adjudicated delinquent under Toledo Municipal Code 537.16. The ordinance, titled "Assault upon a teacher; disrupting school activity," prohibits a person from assaulting, striking or threatening a teacher. *Id.* But it also prohibits a person from "disrupt[ing], disturb[ing] or interfere[ing] with the teaching of any class of students, or disrupt[ing], disturb[ing] or interfere[ing] with any activity conducted in a school, college, or university building, or upon the campus or grounds thereof, or in any public place."

**{¶91}** Nothing in the record included any facts underlying that adjudication. Nevertheless, the trial court found that Glover's adjudication was "an act of violence" showing that he was not "amenable to follow the law" and demonstrating a need to protect the public.

**{¶92}** The findings involving Glover's criminal history are clearly and convincingly not supported by the record because there is nothing in the record to

substantiate the finding that Glover's adjudication was based on a violent act. Indeed, his adjudication could have been based on something as trivial as nonviolent disruption of a class or even a pep rally. And Glover had only one other nontraffic-related conviction, obstructing official business, a misdemeanor.

{¶93} The trial court's conclusion about Glover's past criminal acts clearly and convincingly was not supported by the record. Yet, the record indicates that the trial court placed significant weight on Glover's juvenile adjudication in its proportionality consideration. It found that Glover's adjudication was "an act of violence," an "assault on teachers. That's kind of disturbing. That causes me some pause and some concern." Glover's juvenile record and his misdemeanor obstruction-of-official-business charge indicated to the trial court that he was not "amenable to follow the law." And its sentencing entry stated, "specifically, the court finds that the defendant's criminal history shows a need to protect the public from future crime by the defendant."

{¶94} Removing Glover's acts in this case, there is nothing in Glover's history that indicates he poses a danger to the public. He had a juvenile adjudication without any underlying facts to substantiate the trial court's assertion that it was a violent crime. And he had a misdemeanor obstructing-justice conviction.

{¶95} The record clearly does not support the trial court's findings that Glover's past conduct shows he poses a danger to the public. The trial court's improper findings regarding Glover's past conduct undermines its proportionality finding.

### b. *Glover's current offenses*

{¶96} The Second District has determined that a lack of physical harm requires imposition of concurrent sentences. *State v. Hicks*, 2d Dist. Greene No. 2015-CA-20, 2016-Ohio-1420, ¶ 3, 23 ("we note that there is no evidence that Hicks caused physical harm to any of the residents subject to her fiscal supervision, hence the

conduct does not fit into the category of 'the harm is so great or unusual that no single prison term adequately reflects the seriousness' "). While we do not wish to paint such a broad brush, we find that the lack of physical harm weighs against stacking all of the seven-year aggravated-robbery sentences.

{¶97} This position is bolstered by looking to the Ohio Revised Code. Some statutes carry an enhancement when the offense causes or risks serious physical harm. And the penalties for crimes such as aggravated murder, murder, and child rape carry a life-sentence tail. Thus, the legislature has determined that certain crimes, such as those causing the most serious physical harm, should get longer sentences.

{¶98} Yet, other than life sentences without a possibility for parole, many offenders who commit the most serious crimes may serve significantly shorter terms than Glover. Murder is undoubtedly a more serious crime than aggravated robbery. But a person who purposely takes another person's life may have the opportunity to be paroled after 15 years. Glover, who did not take his victims' lives or cause them physical harm, would have no chance of parole at 15, 20, 25, or even 50 years.

{¶99} The trial court stated, "I really can't think of anything worse than if you had just shot them, and if you killed them. But you know, maybe they wouldn't have to live with the fear and the nightmares that they have as a result of this, because they would be dead." The trial's court's suggestion that only death—and perhaps not even death—was the only worse fate for Glover's victims gives us a glimpse into why the trial court imposed a sentence akin to life, which is longer than many offenders receive for more serious crimes. While this court cannot look at every sentence imposed for every crime, our review above of sentences for crimes causing physical harm bolsters our conclusion that the trial court's aggregate sentence was disproportionate to

Glover's offenses and the danger he poses to the public. The trial court imposed a longer sentence than in *Patton*, 1st Dist. Hamilton No. C-190694, 2021-Ohio-295, at ¶ 2, where the defendant murdered two strangers; *McRae*, 1st Dist. Hamilton No. C-180669, 2020-Ohio-773, at ¶ 5, where the defendant attempted to murder two police officers (and actually shot one); *Prescott*, 8th Dist. Cuyahoga Nos. 107784 and 107789, 2019-Ohio-5114, at ¶ 2, where the defendant was convicted of 14 counts each of aggravated robbery and kidnapping, all with gun specifications, for eight separate events, when the defendant or his accomplices pistol whipped a victim, causing serious injuries; *Consiglio*, 7th Dist. Mahoning No. 21 MA 0066, 2022-Ohio-2340, at ¶ 1-2, where the defendant assaulted a police officer and raped his grandmother; and *Steele*, 5th Dist. Delaware No. 21 CAA 11 0061, 2022-Ohio-712, at ¶ 1, where a jury convicted the defendant of five counts of unlawful sexual conduct with a minor and two counts of rape.

**{¶100}** To be clear, we do not suggest that under the facts of this case, the trial court could not have stacked *some* of the sentences. Rather, we are firmly convinced that the record does not support the trial court's proportionality finding based on it stacking *all* the aggravated-robbery and gun-specification sentences.

**{¶101}** The lack of physical harm, combined with Glover's lack of criminal history, firmly convinces us that the trial court erred by finding that a 60-year sentence was proportionate to his conduct and the danger he poses to the public. This is especially true because before trial, the state offered 15 years in exchange for a guilty plea, and after trial, the state recommended a 20- to 25-year sentence.

**{¶102}** Simply put, a 60-year sentence—akin to a life sentence—was disproportionate to Glover's criminal history, danger he posed to the public, and offenses.

6) *R.C. 2953.08(G)(2) permits this court to modify Glover's sentences*

**{¶103}** Because we found that the record clearly and convincingly did not support the trial court's proportionality finding, R.C. 2953.08(G)(2) permits us to increase, reduce, or otherwise modify a sentence.

**{¶104}** Before trial, the state and the victims agreed to a 15-year sentence if Glover pleaded guilty. And after trial, the state, citing the wishes of some of the victims and officers, recommended a sentence of between 20 and 25 years. We agree that a 25-year sentence is appropriate.

**{¶105}** We note that Glover's appeal did not specifically mention the consecutive sentencing for the gun specifications. And for penalty-enhancing specifications, a trial court need not make consecutive-sentencing findings. *See, e.g., State v. James*, 2015-Ohio-4987, 53 N.E.3d 770, ¶ 47 (8th Dist.) ("With there being no requirement in R.C. 2929.14(B)(1)(g) for the court to make findings of any kind before ordering a third penalty enhancing specification to be served consecutively, the court had no obligation to make any findings."). Nevertheless, the consecutive nature of the gun specifications is relevant to our proportionality determination because we consider the aggregate sentence.

**{¶106}** Therefore, because the trial court's proportionality findings were clearly and convincingly unsupported by the record, we default to a single seven-year sentence for aggravated robbery. The sentences for the six firearm specifications, three years each, shall be served before the aggravated-robbery sentence and consecutive to

each other and the seven-year aggravated-robbery term. Accordingly, we order the trial court to impose an aggregate sentence of 25 years of incarceration.

{¶107} We sustain Glover's sixth assignment of error and remand this cause to the trial court to enter a 25-year sentence consistent with this opinion.

### III.    CONCLUSION

{¶108} We sustain Glover's sixth assignment of error and remand the cause to the trial court to enter an aggregate term of 25 years of incarceration, consistent with this opinion. We affirm the trial court's judgment in all other respects.

Judgment affirmed in part and reversed in part, and cause remanded.

**BERGERON, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.